**MANNING CURTIS BRADSHAW
& BEDNAR LLC**
Brent V. Manning, BManning@mc2b.com, #2075
Chad R. Derum, CDerum@mc2b.com, #9452
170 South Main Street, Suite 900
Salt Lake City, Utah 84101
Telephone: (801) 363-5678
Facsimile: (801) 364-5678

Attorneys for Plaintiffs

FILED
U.S. DISTRICT COURT

2010 DEC 30  A II: 09

DISTRICT OF UTAH

BY:_____
       DEPUTY CLERK

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| JOHN T. BRAUN, MD, THE CRICKET K. BRAUN AND JOHN T. BRAUN FAMILY LIMITED LIABILITY COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>MEDTRONIC SOFAMOR DANEK, INC. AND SDGI HOLDINGS, INC.<br><br>Defendants. | **COMPLAINT**<br><br>Case: 2:10cv01283<br>Assigned To : Alba, Samuel<br>Assign. Date : 12/30/2010<br>Description: Braun et al v. Medtronic Sofamor Danek et al<br><br>———————————————<br>(Jury Demanded) |

---

Plaintiffs John T. Braun, MD ("Dr. Braun") and the Cricket K. Braun and John T. Braun

Family Limited Liability Company ("Braun LLC") hereby sue Medtronic Sofamor Danek, Inc.

("MSD") and SDGI Holdings, Inc. ("SDGI") (collectively "Defendants" or "MSD") and allege as

follows:

## I.  NATURE OF ACTION

This is a civil action for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, unfair competition, negligent misrepresentation, fraudulent inducement, fraudulent concealment, tortious interference with prospective economic relations, declaratory relief, and permanent injunction.

Dr. Braun is a renowned orthopedic spinal surgeon specializing in the treatment of scoliosis, a condition involving abnormal curvature of the spine.  In 1999, Dr. Braun invented a medical device system and method that is designed to treat scoliosis surgically without need for a spinal fusion.  MSD fraudulently induced Dr. Braun to license the invention to MSD, breached the parties' agreement to develop and commercialize the invention, and misappropriated Dr. Braun's intellectual property for its own use.  MSD's unlawful conduct was designed to further MSD's twin goals of seeking to secure Dr. Braun's loyalty to MSD's existing line of lucrative surgical devices in his daily surgical practice and precluding the entry of a potential competitive threat in the market for spinal surgery devices that MSD dominates.

To induce Dr. Braun to license the invention MSD praised Dr. Braun's device system for its novelty and uniqueness in the market for scoliosis treatments.  MSD promised Dr. Braun that it could ensure that his system would be the "first to market," assured him that he and MSD would work together as part of a team to reach that goal, that MSD would make the development of his invention its priority in commercializing a fusionless device, and that MSD's patent strategy would be oriented to protecting Dr. Braun and his valuable intellectual property.  In April 2000, in reliance on MSD's representations, Dr. Braun agreed to execute a license agreement that committed MSD to develop and commercialize the invention.  What MSD never

told Dr. Braun before signing the license agreement is that eight days before Dr. Braun disclosed his invention to MSD, MSD filed multiple patent applications for fusionless device concepts that included elements that MSD specifically told Dr. Braun were novel and unique aspects of his more comprehensive and valuable invention.  MSD then waited until after its own patents had issued before even filing for a provisional application for Dr. Braun's invention--more than eighteen months after Dr. Braun licensed his invention to MSD.

In addition to failing to disclose to Dr. Braun that it had filed patents relating to some aspects of the intellectual property underlying Dr. Braun's invention, MSD failed to disclose that it intended to pursue the development of other fusionless device concepts that may be mutually exclusive with the commercialization of Dr. Braun's invention.  Accordingly, MSD had an additional undisclosed motive to capture, but not develop, Dr. Braun's invention and thereby preclude its development and commercialization by MSD's competitors.  Because MSD wanted to eliminate any potential competitive threat that would arise if Dr. Braun developed the invention elsewhere, MSD concealed critical material facts about its plans and simply told Dr. Braun whatever was necessary to induce him to enter into a license agreement and deter him from bringing his intellectual property to MSD's competitors.

In 2008, after stringing Dr. Braun along with promises and assurances of its good faith performance for approximately nine years, MSD announced to Dr. Braun that it was "going in another direction," without fulfilling its promise to commercialize Dr. Braun's invention.  It is now apparent, in fact, that MSD never intended to commercialize Dr. Braun's invention.  Rather, MSD's objective was to acquire the rights to Dr. Braun's invention so that it could be

3

systematically dismantled, drained of its value, incorporated into MSD's competing technologies, and discarded

MSD's conduct has been directed at protecting its own interests in the development of a fusionless device and protecting its lucrative market share in existing scoliosis treatment devices. MSD's conduct, representations and omissions have all been calculated to freeze the development of Dr. Braun's intellectual property, shut him out of that market, and preclude Dr. Braun from posing a competitive threat to MSD's market for its own competing devices. Critically, in addition to causing Dr. Braun significant damage, MSD's conduct has also deprived patients of the opportunity to benefit from important advances in the treatment of scoliosis that Dr. Braun invented.

Through this action, Dr. Braun seeks to recover damages caused by Defendants' breaches and tortious conduct. Dr. Braun also seeks to prevent Defendants from unjustly retaining the benefit of Dr. Braun's valuable intellectual property which Defendants received through their negligent misrepresentations and fraudulent inducements.

Each of the following paragraphs incorporates by this reference all the numbered paragraphs that precede them, without waiving the right to plead in the alternative.

## II. JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy exceeds $75,000.

2.      The Court has personal jurisdiction over Defendants pursuant to the Utah Long Arm Statute, Utah Code Ann. § 78B-3-205, because Defendants have transacted business in this

state, contracted to supply services or goods in the state, and caused injury to Dr. Braun within this state.

3.      Venue is proper pursuant to 28 U.S.C. § 1391 (a) because a substantial part of the events giving rise to this action took place in Utah.

### III.  THE PARTIES

4.      Dr. Braun is an individual, formerly residing in Salt Lake City, Utah, and now residing in Charlotte, Vermont.

5.      Braun LLC is Utah Limited Liability Company.  Dr. Braun is the organizer and manager of Braun LLC.

6.      MSD is an Indiana corporation with its principal place of business in Memphis, Tennessee.

7.      SDGI is a Delaware corporation with its principal place of business in Memphis, Tennessee.

### IV.  GENERAL ALLEGATIONS

#### Dr. Braun's Background

8.      Dr. Braun is an internationally-recognized orthopedic spinal surgeon who specializes in treating scoliosis, a medical condition that involves irregular side-to-side curvature of the spine.

9.      Dr. Braun received his medical degree from Cornell University Medical College in 1989. From 1989 to 1990, Dr. Braun served a general surgery internship at the New York Hospital-Cornell Medical Center, located in New York, New York. From 1990 to 1994, Dr. Braun served an Orthopedic Surgery Residency at the Hospital for Special Surgery, also in New York, New York. From 1994 to 1995, Dr. Braun served a John H. Moe Fellowship in Orthopedic Spine Surgery at the Twin Cities Scoliosis Spine Center and the University of Minnesota in Minneapolis, Minnesota.

10.     Following his training in spinal surgery, Dr. Braun served for four years as an active-duty officer in the United States Air Force, obtaining the rank of Major. During his service, Dr. Braun served as the Chief of the Orthopedic Spine Services at both Brooke Army Medical Center, Fort Sam Houston, Texas and Wilford Hall Medical Center, Lackland Air Force Base, Texas.

11.     From 1999 to 2006, Dr. Braun served as a tenure-track Assistant Professor in the Department of Orthopedics at the University of Utah School of Medicine. During this period, he also served as an Adjunct Assistant Professor in the Department of Neurosurgery at the University of Utah School of Medicine. In addition to his teaching responsibilities, Dr. Braun also served on the hospital staff at Intermountain Shriners Hospital for Children and Primary Children's Medical Center. From 2005 to 2006, Dr. Braun served as the Director of the Spine Trauma Program in the Departments of Neurosurgery and Orthopedics at Primary Children's Medical Center and University of Utah School of Medicine.

12.     Since 2006, Dr. Braun has served as a tenured Associate Professor in the Department of Orthopedics and Rehabilitation at the University of Vermont College of Medicine

6

in Burlington, Vermont. Dr. Braun is also an adjunct Associate Professor in the Department of Pediatrics and the Division of Neurosurgery at the University of Vermont College of Medicine in Burlington, Vermont.

13.     During his career, Dr. Braun has performed an estimated 3,000 spinal surgeries. Within his specialty of scoliosis surgery, Dr. Braun has performed an estimated 1,000 procedures aimed at treating scoliosis and other spinal deformities.

## Background Regarding MSD and SDGI

14.     MSD is a medical technology company engaged in research, design, manufacture, and sale of medical devices and medical therapies. MSD's customers are located across the nation and include hospitals, clinics, third-party healthcare providers, distributors, and other institutions.

15.     MSD's business is divided among several business segments, including MSD's Spinal division. In the second quarter of 2010 alone, it is estimated that MSD generated more than $800 million in revenue from sales of medical devices associated with its Spinal division. Annual sales for MSD's Spinal division are reported to be $3.5 billion, accounting for half of the $7 billion spinal implant market.

16.     Within its Spinal division, MSD develops and markets products intended to correct and stabilize abnormal spine curves. MSD markets these products in Utah and many other states and foreign countries. These products consist principally of various rods, hooks, screws, staples and connecting components, implant components that can be rigidly locked into a variety of configurations to treat various spinal conditions, as well as BMP (bone morphogenic protein).

7

17.     SDGI is an affiliate of MSD.

### Devices Used to Treat Scoliosis Surgically

18.     Currently, the three most common and accepted treatments for patients with scoliosis are: observation; bracing; and spinal fusion surgery.

19.     This Complaint concerns the devices used in the surgical treatment of scoliosis. Scoliosis affects between 2% and 4% of people.  It is estimated that approximately 27,000 cases of scoliosis each year are serious enough to require surgery.

20.     The products that MSD currently markets to treat scoliosis (as described in Paragraph 16) are generally similar in nature to the products offered by other companies for correcting problems related to abnormal spinal curvature.  Such products, which may also include other connecting components and implant components, constitute the relevant market.

21.     Currently, the most frequent method of treating scoliosis surgically is through a two-step procedure.  The first step involves the use of medical instrumentation (such as rods, hooks, and screws) to correct the scoliosis and hold the spine in place while the spine fuses.  The second step involves the actual "fusion" of the spine.  Spinal fusion involves placing bone graft material (typically harvested from the patient's hip bone) between the affected bones in the spine to encourage them to fuse, or join together.

22.     MSD markets lines of products used to treat scoliosis surgically, including, for example, the CD Horizon Legacy Spinal System.  MSD markets these products in Utah, across the United States and in many foreign countries.

8

23.     MSD dominates the market for implants used in scoliosis surgery. Approximately half of all implants used in scoliosis surgery in the United States are made by MSD.  In fact, according to MSD's own figures, there have been over 500,000 surgeries performed with the CD Horizon Legacy Spinal System, MSD's current implant system for treating scoliosis through spinal fusion.

24.     The typical spinal fusion surgery requires approximately $25,000 in medical instrumentation, such as instrumentation included in MSD's CD Horizon Legacy Spinal System.

### Dr. Braun's Revenue Generation for MSD

25.     During his training at some of the nation's leading spinal surgery hospitals, Dr. Braun became familiar with MSD's instrumentation for the treatment of scoliosis and other spinal deformities.

26.     In 1999, while serving as an Assistant Professor in the Department of Orthopedics at the University of Utah School of Medicine, Dr. Braun was among the only spinal surgeons at the University of Utah who used MSD's medical instrumentation.  Indeed, at that time, MSD had not heavily penetrated the market for devices used in spinal surgery in the Intermountain West.

27.     During the course of his tenure as a surgeon at the University of Utah and other Utah hospitals, Dr. Braun regularly implanted more than $100,000 worth of MSD's medical instrumentation in his patients each month, or approximately $1.2 million each year.

28.     During this period, MSD recognized Dr. Braun as an important spinal surgeon who could meaningfully influence the choices of other surgeons with respect to what brands of medical devices to use in their orthopedic spinal surgery practices.

9

29.     This was particularly true because Dr. Braun held a teaching role in the most important teaching hospital in the Intermountain West and thus was in a position to influence the instrumentation decisions of both practicing surgeons, as well as succeeding generations of spinal surgeons who were training at the University of Utah.

### The Fusionless Alternative to Fusion Surgery for Scoliosis

30.     Although fusion is the predominant surgical treatment for scoliosis, it is not an ideal treatment for this condition. In particular, fusion interferes with the spine's normal physiology because it replaces the spine's natural flexibility with a fixed bony mass that limits motion. In addition, recovery times for fusion are often lengthy because the surgical approach of fusion surgery is generally through the back (posterior side), which requires deep and lengthy incisions through substantial amounts of tissue. One major concern is the long-term degradation of the spine resulting from fusion surgery because of the increased pressure that the fusion places on the lumbar spine below the fusion. Such pressure can result in premature degeneration of the discs in the unfused portion of the spine and can lead to multiple additional spine surgeries over the course of a lifetime. Thus, it is unclear whether the thousands of patients undergoing fusion procedures for scoliosis today will need major follow-up surgery in the years or decades to come.

31.     According to MSD's own 2003 data, nearly 90% of patients surveyed indicated that they would prefer a fusionless option to scoliosis surgery. This overwhelming patient preference, however, is inconsistent with MSD's current investment in the surgical treatment of

scoliosis through fusion and its enormous market-share in the treatment of scoliosis through fusion surgery.

### The Shape Memory Alloy Staple

32.    Between 1998 and 1999, Dr. Braun performed medical studies for MSD to test a device that MSD had developed which was intended to provide an alternative therapy for scoliosis treatment.

33.    That device, known as the "Shape Memory Alloy Staple," is a staple-shaped device that is surgically implanted in two adjacent vertebrae across the discs.  The staple is intended to provide passive resistance against the continued progression of the spinal curvature associated with mild and moderate cases of scoliosis.

34.    Dr. Braun's research found that the staple had potential to slow the rate of progression of spinal curvature, an objective that is similarly achieved through standard brace treatment.  However, Dr. Braun also discovered that the staple had serious shortcomings, such as the potential to loosen within the vertebra over time--thus counteracting the staple's resistance to further curvature.  Additionally, because the staple provides only "passive" resistance to the progression of scoliosis, it does not provide a viable alternative to fusion surgery.

35.    Although MSD never obtained regulatory approval for use of the staple in fusionless scoliosis surgery, it did obtain FDA 510(k) approval for other indications outside the spine.  Without FDA approval for use of the staple in fusionless scoliosis surgery, MSD was not able to market the staple at all and the staple has not been widely adopted among spinal surgeons for use in treating spinal deformities like scoliosis.

11

36.      Through his daily experience treating scoliosis patients, performing many spinal surgeries including fusion surgeries, researching conditions of the spine and testing spinal implants, Dr. Braun has become intimately familiar with the options available to treat scoliosis.

### Dr. Braun's 1999 Fusionless Device Disclosure to MSD

37.      In October 1999, Dr. Braun invented a device system and method designed to be used as a fusionless alternative in scoliosis surgery and the correction of spinal deformities.  The device system consisted of a bone "anchor" and ligament tether system and included various designs for crimps, ligaments, and biologic attachments along with methods for using the system.  In using the system, a surgeon implants the anchor along one or more vertebrae of the spine on the convexity of the spinal deformity.  These anchors are then connected with a "ligament tether," made of a flexible, implantable material that links together the anchors.  The tether is then tensioned at each disc level to allow segmental correction of the spinal deformity, thus returning the spine to a more normal alignment.  This system is designed to allow initial "active correction" of the spinal deformity by the surgeon, with additional "passive correction" over time while preserving growth, motion and function of the spine and avoiding the need for a spinal fusion.

38.      Dr. Braun's invention, which he reduced to a notarized writing at the time of the invention, described several devices and methods for providing active correction of spinal deformities using the bone anchor/tether system described above (hereinafter the "Invention"). The Invention presented several unique innovations in the treatment of scoliosis without fusion.

39.      On October 28, 1999, Dr. Braun traveled to MSD's offices in Memphis, Tennessee.  At the meeting, Dr. Braun confidentially disclosed the Invention to MSD.

12

40.     MSD did not disclose to Dr. Braun any of its plans with respect to fusionless scoliosis devices at that meeting.  Critically, MSD did not disclose that, on October 20, 2008, just eight days before Dr. Braun disclosed his Invention to MSD, MSD had filed four patent applications specifically directed at fusionless treatment of spinal deformities.

41.     Dr. Braun had no reason to suspect that MSD had filed such patent applications. At the time of Dr. Braun's disclosure, MSD had not commercialized any fusionless device for the treatment of scoliosis.  MSD's work until that time in this area had concentrated only on passive correction of spinal deformities, rather than active correction using fusionless techniques and devices.

42.     Following the parties' October 28, 1999 meeting, MSD represented that it was interested in pursuing a license agreement with Dr. Braun to commercialize the Invention that Dr. Braun confidentially disclosed to MSD.

43.     Dr. Braun agreed to discuss licensing the Invention to MSD because he wanted to build a device that he could use to improve the lives and surgical outcomes of his scoliosis patients.

44.     MSD made itself appear to be willing to help Dr. Braun reach that goal.  MSD told Dr. Braun that, on average, MSD took only two years to bring an idea "from napkin to patient," meaning from a preliminary drawing to a device that could be implanted in a patient. MSD also represented that its success in getting devices to market was better than any other company, and thus MSD was Dr. Braun's best bet for developing and commercializing the Invention.  Indeed, a consistent theme running through MSD's effort to secure Dr. Braun's agreement to a license agreement was MSD's representation that it would take MSD two years to

13

obtain a patent and two years to get the device to market.

### Negotiations for the License Agreement

45.     In December 1999, Dr. Braun met again with MSD in Memphis to discuss the creation of a device prototype and the anticipated steps that would be required to commercialize the Invention.

46.     At this same time, the parties were negotiating specific terms of a potential licensing agreement that would permit MSD to license the Invention from Dr. Braun.  By Christmas 1999, the parties had agreed upon terms verbally and Dr. Braun was told that a final contract document was "in the mail."  The document never arrived.  When MSD's Vice President of Technology Development, Mike Sherman ("Sherman") took a ski trip to Utah to ski with Dr. Braun shortly thereafter, he was supposed to bring the document with him for Dr. Braun to sign.  Sherman, however, told Dr. Braun that he had "forgotten" the document, but would send it when he got home.

47.     After Sherman returned home, it became apparent that no document was to be sent.  Only then, upon Dr. Braun's questioning, did Sherman finally admit that he thought the proposed agreement was not worth what Dr. Braun thought it was worth, and that the terms the parties had agreed upon verbally were too great a commitment for MSD.  Sherman told Dr. Braun that MSD wanted to renegotiate.

48.     After many months of negotiations that had already led to a verbal agreement and, by Sherman's report, a written document, Dr. Braun was not interested in reinitiating the process of negotiation.  Accordingly, by the end of January 2000, negotiations on a potential license agreement stalled.

49.     Dr. Braun told Sherman that if MSD was unable to find the value in Dr. Braun's Invention that he would merely approach other companies.  Because of the potentially large market for Dr. Braun's Invention, MSD was concerned that there would be significant interest among MSD's competitors in obtaining a license to develop and commercialize Dr. Braun's Invention.

50.     Additionally, as negotiations with MSD stalled, Dr. Braun began trialing other medical instrumentation systems in his surgical practice made by various other companies, thus jeopardizing a monthly stream of revenue for MSD that exceeded $100,000.

### MSD's Sales Representatives Intervene to Save the Deal

51.     After Dr. Braun demonstrated interest in working with other companies in January 2000, MSD soon came back in February 2000 and sought to pressure him to license the Invention to MSD.

52.     As the prospects of concluding a licensing agreement had become more tenuous and the risk that Dr. Braun would bring the Invention to a competitor increased, MSD's sales representatives intervened in these negotiations to assure Dr. Braun that MSD could meet all of his needs and demands..

53.     The intervention of MSD's sales representatives reveals where MSD's true motivations lay.  Although it was unknown to Dr. Braun at the time, it is now well documented in mainstream media stories, congressional inquiries, and Department of Justice actions that one of the major ways MSD lured surgeons to use MSD's products in their daily surgical practice was to enter into royalty and consulting agreements with surgeons that were merely vehicles for MSD to make significant payments to surgeons in an effort to procure the surgeons' loyalty to

MSD and its products.

54.    Unknown to Dr. Braun, MSD's sales representatives intervened in the parties' negotiations to secure Dr. Braun's loyalty to MSD's line of surgical devices and preclude him from creating profitable relationships with MSD's competitors, regardless of whether it ever built Dr. Braun's invention.

55.    Dr. Braun knew some of MSD's sales representatives through his interaction with them in his daily surgical practice where their primary role was to make sure that Dr. Braun remained a loyal patron of MSD's existing line of surgical instrumentation.  During the late stage of the parties' negotiations, however, MSD brought in its top sales executives in the region, including Mark Kuzio ("Kuzio"), to put pressure on Dr. Braun to license the Invention to MSD.

56.    Kuzio represented to Dr. Braun that MSD intended for Dr. Braun to lead the development of his Invention, that Dr. Braun and MSD were on the same "team," that MSD was the best company to get the device commercialized, and that MSD would make Dr. Braun's Invention its priority.  MSD also represented that it would pursue a broad and comprehensive patent strategy that would seek to extend the patent for as long as possible and keep potential infringers away from the Invention.

### MSD Falsely Represents and Conceals Material Facts

57.    In order to persuade him to develop the Invention with MSD, as opposed to one of MSD's competitors, MSD misrepresented, or failed to represent accurately, information concerning then-existing facts that were known to MSD, or should have been known to MSD.

58.    MSD made representations to Dr. Braun to lead him to believe that MSD had the present willingness, intent and ability to develop and commercialize his Invention.  MSD

represented to Dr. Braun that MSD believed the Invention was novel and unique in the market

for devices used to treat spinal deformities.  MSD specifically told Dr. Braun that the ligament

tether aspect of the Invention was novel and unique, both to MSD and the world-at-large.

Individuals who made such statements included, but were not limited to: Sherman; Kuzio; John

Pafford ("Pafford"); and Troy Drewry ("Drewry").

59.     MSD's representatives assured Dr. Braun that he would have a market-ready

product within two years, that MSD and Dr. Braun would be on the same "team" and that MSD's

patent strategy would be broad and comprehensive and designed to protect Dr. Braun's interests.

60.     MSD, however, failed to disclose its true intentions.  MSD did not disclose that it

actively intended to pursue development of other fusionless devices that Dr. Braun did not know

about, or that it had filed patent applications concerning the tethering aspect of Dr. Braun's

Invention that MSD specifically told Dr. Braun was a novel and unique aspect of his more

comprehensive device system.  Instead, MSD persuaded Dr. Braun that MSD's strategy was to

protect as much of Dr. Braun's ideas as possible, and that he would be part of the MSD "family."

61.     As FDA approval is necessary to market a device, MSD assured Dr. Braun not

only that FDA approval would be sought, regardless of the avenue required (i.e., 510(k)

approval, or Premarket Approval/Investigational Device Exemption), but that MSD's efforts

would result in his device being the first and probably only FDA-approved device on the market

indicated for fusionless scoliosis surgery.

62.     Moreover, MSD failed to disclose that its efforts to execute a license agreement

were being driven by the desire to retain Dr. Braun's valuable business as a customer of MSD's

surgical hardware.  In other words, although MSD did not necessarily have an interest in

17

commercializing an expensive new device that would compete with its existing fusion instrumentation or its other plans to develop its own fusionless devices, it did have an interest in retaining Dr. Braun's loyalty as an MSD customer.

63.     Indeed, because Dr. Braun's daily surgical practice generated more than $1 million each year for MSD, MSD had an undisclosed intent to preserve that lucrative stream of revenue for as long as possible, regardless of whether the Invention was ever brought to market.

### The Invention License Agreement

64.     By February of 2000, MSD had effectively induced Dr. Braun to continue negotiations for a license agreement exclusively with MSD by representing that MSD had the present intent, readiness, and willingness to develop and commercialize the Invention.

65.     After negotiations continued through February and March, Dr. Braun and MSD executed a License Agreement (the "License Agreement") concerning the Invention on April 1, 2000.  A copy of the License Agreement is attached as Exhibit A.  Under the License Agreement, Dr. Braun agreed to license to MSD the Invention that was described in the written invention description that Dr. Braun had confidentially disclosed to MSD on October 28, 1999. A copy of that invention disclosure was included as an exhibit to the License Agreement.

66.     Dr. Braun conducted negotiations for the License Agreement principally in Utah.  MSD's employees also traveled to Utah multiple times to negotiate the License Agreement.  Dr. Braun was a Utah resident at that time and MSD was aware of this fact.

67.     The License Agreement provided MSD with an irrevocable and exclusive worldwide license to commercialize the Invention.  The License Agreement also established a system under which Dr. Braun would receive royalties accruing from the sale of the Invention,

18

once brought to market.

68.     Essentially all of the consideration to Dr. Braun under the License Agreement, and the reason Dr. Braun was willing to devote himself to an exclusive license agreement, was the commitment MSD made to patent, obtain regulatory approval for, and commercialize the Invention.

69.     In exchange for Dr. Braun's agreement to provide MSD an irrevocable and exclusive worldwide license obligating MSD to commercialize the Invention, MSD agreed to undertake several obligations essential to the development and commercialization of the Invention.

70.     Among other responsibilities, MSD agreed that it "shall conduct research and development necessary to commercialize a Licensed Product." The term "Licensed Product" is defined in the License Agreement as the Invention described in Dr. Braun's confidential disclosure to MSD and as any product that would infringe upon that disclosure but for the License.

71.     In addition, MSD agreed in Article III, Section 3.2 of the License Agreement that it "shall be responsible at its own expense" for at least the following tasks:

   a.     Prepare and execute a development work plan in accordance with the proposed development plan attached to the License Agreement;

   b.     Prepare, file, and conduct an Investigational Device Exemption ("IDE") with the FDA, if required;

   c.     Obtain a Premarket Approval clearance with the FDA, if required;

19

     d.     Provide worldwide marketing, sales and distribution of Licensed Product after receipt of appropriate regulatory approvals;

     e.     Provide financial support to Dr. Braun to promote ongoing research efforts relating to the development and evaluation of the Invention (including both technical and clinical evaluations); and

     f.     Financially support Dr. Braun's travel in connection with presentation of research results at national and international meetings.

72.     In addition to the foregoing commitments, MSD agreed under Section 5.1 of the License Agreement that it would, at its expense, "file and maintain patent applications and any patents that may issue or be granted thereon" on the Invention in the United States. While "all final decisions relating" to patent prosecution in the United States rested with MSD, MSD agreed to use "sound and reasonable judgment in making such prosecution decisions."

73.     Dr. Braun's obligations under the License Agreement were set forth in Section 3.3 and included the following:

     a.     Provide assistance and input relating to the filing and prosecution of Licensed Patents;

     b.     Develop and execute a research protocol for the continuation of a large animal scoliosis model;

     c.     Evaluate the Licensed Product and prototypes thereof in the large animal scoliosis model discussed above;

     d.     Assume the responsibilities as the Primary Investigator for all clinical studies performed for submission to the FDA;

    e.      Assist MSD with any medical education programs relating to Licensed Products; and

    f.      Disseminate and/or publish the results of his research in peer review journals and at appropriate surgeon meetings or symposia.

74.    In connection with MSD's obligation under Section 3.2 of the License Agreement to prepare and execute a "development work plan," the parties included a proposed Development Plan as Exhibit B to the License Agreement (the "Development Plan"). This Development Plan was created by MSD before the parties entered into the License Agreement. In the Development Plan, MSD mapped out an anticipated two-year timeline within which the parties could move from the execution of the License Agreement to the beginning of human trials on an FDA-approved device.

75.    In the Development Plan, MSD represented that, during the year 2000, it could accomplish such tasks as a "prior art review and initial intellectual property filings," the selection of the "best" anchoring and tethering concept for the device, and manufacture of "initial quantities of implants for use in studies. Furthermore, MSD represented in the Development Plan that, during 2001, it could (among other things) finalize implant and instrument designs for the device, and determine regulatory strategy and file with the FDA (with the expectation of an "IDE/PMA"). MSD represented in the Development Plan that during 2002 it could "deliver evaluation implants and instruments to surgeons," and "begin human trials (if approved by the FDA)."

76.    In the Research Financial Plan that the parties included as Exhibit C to the License Agreement, the parties estimated that MSD's financial commitment to Dr. Braun's

research for the first three years, following execution of the agreement, would exceed $400,000.00.

77.     The Research Financial Plan also outlined the nature of the research that Dr. Braun would need to perform on the Invention in order to "allow for the initiation of human trials as set forth in the Development Plan."

78.     After the License Agreement was executed, Dr. Braun devoted himself to fulfilling his obligations under the Agreement.  He poured his time and energy into performing his commitments under the License Agreement in anticipation of rapidly bringing to market a fusionless scoliosis device.  Instead of pursuing the many other highly lucrative opportunities available to him, given his background and qualifications, Dr. Braun devoted himself to the research needed to develop and enhance the Invention.

79.     After the execution of that agreement, Dr. Braun invested thousands of hours performing and executing basic science and animal research required to develop the Invention. He worked tirelessly to synthesize his study findings into research papers that could be published in peer-reviewed medical journals.  In fact, since 2001, Dr. Braun has published more than a dozen scholarly articles addressing the application of an anchor/tethering device system in the fusionless treatment of scoliosis.  Dr. Braun's findings were published in the most reputable medical journals related to orthopedic spinal medicine, including the *Journal of Bone and Joint Surgery* and *Spine*.

80.     Dr. Braun's research demonstrated that the anchor/tether approach that is the subject of the License Agreement provides a viable alternative to fusion surgery with potentially

22

better outcomes than fusion surgery in preserving the growth, motion and function of the spine for scoliosis patients.

81.     Dr. Braun also presented his research findings on over 60 occasions at conferences, and meetings of spinal surgeons across the country and around the world.

82.     Dr. Braun also received numerous awards for his research relating to fusionless scoliosis surgery.  His awards included the 2007 Russell Hibbs Award in Basic Science, which he received at the 42nd Annual Meeting of the Scoliosis Research Society in Edinburgh, Scotland, UK.  The Hibbs Award is the highest research honor awarded by the Scoliosis Research Society.

83.     In contrast to Dr. Braun's tireless efforts, MSD failed to perform its most significant obligations under the License Agreement.  Among other breaches, MSD did not pursue or obtain the necessary regulatory approvals (including an IDE and PreMarket approval from the FDA), did not develop or perform a development plan for the Invention, did not provide sufficient financial support to Dr. Braun's ongoing research necessary to commercialize the Invention, did not support Dr. Braun's travel related to the Invention, and did not use sound judgment in pursuing patent protection necessary to protect Dr. Braun's interest in the Invention.

84.     Significantly, MSD did almost nothing to obtain the required regulatory approvals, one of the most time-consuming and expensive tasks covered by the License Agreement.  For example, an IDE study may take between 5-10 years and cost between $20-80 million dollars.  MSD knew that its ability to invest in and pursue such regulatory approval was the principal consideration for Dr. Braun's promise to grant MSD an exclusive license on the Invention.  Indeed, MSD also knew that without investing in and pursuing such regulatory

23

approval, it could never bring Dr. Braun's Invention to market.

85.     Although MSD took some initial steps to begin the FDA approval process and obtain a rapid and inexpensive approval through the FDA 510(k) process, this was not successful. It was then absolutely clear, as MSD had anticipated, that an IDE study would be required to obtain FDA approval. Dr. Braun continued to perform pre-clinical work to support the Invention and an FDA IDE study, but MSD did nothing more to pursue FDA approval for the Invention. Dr. Braun often attempted to discuss regulatory approval strategies with MSD representatives, but MSD took no action to obtain PreMarket Approval/Investigational Device Exemption, or other necessary regulatory approvals.

86.     Additionally, although MSD represented to Dr. Braun in the Development Plan that it would pursue a two-year timeline to take the Invention to the human trial stage, it did extraordinarily little to pursue or accomplish that goal. MSD has neither accomplished most of the items that it represented could be accomplished within two years, nor did it ever make reasonable modifications to the Development Plan to accomplish those items.

87.     MSD also failed to provide support for Dr. Braun's research as required by the License Agreement. Although MSD provided pre-clinical financial support for Dr. Braun's work, that support never extended into any clinical research involving a human trial, whether through an FDA study or otherwise.

88.     The few items that MSD did perform were insufficient, performed in a way that undermined the purpose of the License Agreement, and were inconsistent with MSD's own patent strategies during the same timeframe. Unlike MSD's own patents on fusionless technologies, which it generally obtained two to three years after filing the patent application,

24

MSD took seven years to obtain a patent for Dr. Braun.  Furthermore, unlike MSD's own patents on fusionless technologies, which it continuously supported, expanded and added to through both method and device patents, as well as additional patent applications, MSD sought only a single patent for Braun and did no additional work to support or expand that patent.

89.   In 2007, MSD finally obtained a patent for part of the Invention that Dr. Braun disclosed to MSD.  Having already unnecessarily delayed the prosecution of that patent, MSD also narrowed its scope, leaving significant portions of the Invention unprotected.

90.   When Dr. Braun became concerned about MSD's failure to perform under the License Agreement, he raised these issues with MSD and attempted to negotiate a new schedule to put the development of the Invention back on track.  In an effort to deter Dr. Braun from exercising his rights against MSD and discovering MSD's unlawful conduct, MSD refused to acknowledge any failures, consistently claimed that it had fully performed all of its obligations, and assured Dr. Braun that it would perform in the future.  Dr. Braun relied on these assurances.

91.   By 2005, many MSD employees with whom Dr. Braun had worked on the Invention had left MSD, including, for example, engineer Fred Molz, Ph.D ("Molz"). Leadership on the development of the Invention on MSD's side changed hands several times over the next few years but was initially left to Tommy Carls.  Mr. Carls admitted to Dr. Braun in 2005 that he knew nothing about the status of the Invention.  Subsequently, Mr. Carls suggested that the contract be renegotiated.

92.   Multiple discussions ensued over the next few years involving Dr. Braun and various representatives of MSD, including Brad Cannon ("Cannon"), Tommy Carls ("Carls"), Randy Allard ("Allard"), John Serbousek ("Serbousek"), and Jim Cloar ("Cloar").  Several

25

options to resolve the issues related to Dr. Braun's contracts were discussed with different MSD representatives at different times after 2005. Eventually, these discussions turned to how the parties might part ways. However, MSD then offered to return to Dr. Braun only the narrow patent it had obtained for a portion of the Invention, not all of the intellectual property included in the Invention that Dr. Braun had disclosed to MSD in October of 1999 that included multiple devices, methods and concepts relating to fusionless scoliosis treatment. It also later became clear that MSD had squandered the value of Dr. Braun's ideas and misappropriated others and was not interested in returning the full scope of the Invention; only the thin patent that covered part of the Invention. Problematically, MSD also insisted on obtaining a full release from Dr. Braun as part of that transaction. When Dr. Braun insisted that his full Invention be returned, communication between the parties broke down.

93.     In mid-2008, MSD, through Cannon, represented to Dr. Braun that "we're going to go in another direction" with respect to the development and commercialization of the Invention. Other than making clear that MSD did not intend to honor its contractual obligations, MSD was not forthcoming about what that statement meant. MSD did not disclose whether it was foregoing development of a fusionless scoliosis device altogether, or otherwise.

94.     Through MSD's November 23, 2008 letter to Dr. Braun, it soon became clear that MSD was, in fact, aggressively interested in pursuing fusionless scoliosis, but wanted to do so without any further obligation to Dr. Braun. MSD apparently believed that offering to return only the narrow patent to Dr. Braun would not limit those efforts. Returning the entire Invention Dr. Braun disclosed would limit those efforts, however, and thus MSD never offered to return the entire Invention.

95.    Instead of proposing to return the entire Invention, MSD's November 23, 2008 letter referred Dr. Braun to its own patents for ligament tethers that pre-dated Dr. Braun's disclosure of the Invention in 1999.  MSD now claims that these patents already covered looped tethers and the active correction of scoliosis.  MSD's representation, in 2008, that it already owned looped tethers and had patented methods for the active correction of scoliosis that pre-dated his Invention was never made to Dr. Braun any time before he disclosed the Invention. Instead, MSD praised Dr. Braun at that time, particularly for the novelty and uniqueness of the tethering and active correction aspects of his Invention.  Dr. Braun relied on those representations in deciding to license the Invention to MSD rather than pursue development of the Invention through one of MSD's competitors, which would have sought aggressively to protect all aspects of the comprehensive Invention.

### The Concave Device License

96.    After the parties executed the License Agreement in April 2000, Dr. Braun believed and relied upon MSD's representations, promises, and assurances that MSD would perform, had performed, and would continue to perform under the License Agreement.

97.    Because he still believed at that time that MSD would honor its commitments to him, Dr. Braun entered into a second agreement with MSD to license the rights to commercialize another device for the fusionless treatment of scoliosis using a concave spinal approach (the "Concave Device License") on July 9, 2003.

98.    The parties to this agreement were Braun LLC and SDGI.

99.    Under the Concave Device License, Braun LLC assigned to SDGI an exclusive

27

worldwide license to use, sell, and otherwise commercialize and exploit the Concave Device.

100.    In exchange, SDGI also agreed to pay certain royalty and other payments, including paying Braun LLC "Fifty Thousand Dollars ($50,000.00) upon the issuance of a patent included in the Licensed Patents having at least one valid claim covering Licensed Products."

101.    On November 20, 2007, U.S. Patent No. 7,297,146 issued, which included at least one valid claim covering the product licensed under the Concave Device License.

102.    SDGI never made the $50,000 payment to Braun LLC.

103.    SDGI also agreed to undertake responsibilities to develop the Concave Device, including preparing and executing a development plan, pursuing regulatory approval, providing financial support to Dr. Braun's research, and providing worldwide marketing, sales and distribution.

104.    When Dr. Braun met with MSD and SDGI representatives in February of 2006, MSD employee Carls admitted that MSD and SDGI "[haven't] done a thing" with respect to the Concave Device.

### FIRST CLAIM FOR RELIEF

#### Breach of Contract (License Agreement)

105.    Dr. Braun and MSD entered into a valid agreement for the license of Dr. Braun's Invention.

106.    Dr. Braun fully performed his obligations under the License Agreement.

107.    Despite the clarity of its responsibilities under the License Agreement, MSD has failed in its mandatory obligation to "conduct research and development necessary to commercialize a Licensed Product," and has:

a.      failed to prepare and execute a development work plan as required under Section 3.2(a);

b.      failed to prepare, file, or conduct an IDE with the FDA as required under Section 3.2(b);

c.      failed to obtain a PreMarket Approval clearance with the FDA as required under Section 3.2(c);

d.      failed to provide worldwide marketing, sales, and distribution of a Licensed Product as required under Section 3.2(d);

e.      failed to provide financial support for clinical research efforts relating to the development and evaluation of the Invention (including both technical and clinical evaluations) as required under Section 3.2(e);

f.      failed to provide financial support for Dr. Braun's travel relating to the Invention as required under Section 3.2(f); and

g.      failed to use sound and reasonable judgment in obtaining the patent protection necessary to protect Dr. Braun's interest in the Invention.

108.    As a result of MSD's breaches of the License Agreement, Dr. Braun has been damaged in at least the following ways:

a.      In reliance on MSD's representations that it would perform as required by the License Agreement, Dr. Braun has invested time and energy in studying and developing the Invention. As a result, Dr. Braun has forgone the opportunity to pursue other career paths in the medical field, given up significant income, lost opportunities for career advancement, and lost opportunities to enhance his reputation in his field that he would have received if MSD had performed;

b.      Dr. Braun has also foregone development of the Invention through others who would have pursued intellectual property protection for the entire Invention;

c.      Due to MSD's failure to perform its contractual obligation to pursue proper regulatory approvals, Dr. Braun has lost the benefit of MSD's financial support of these costly approvals and the pursuit of such approvals for the Invention have been indefinitely sidelined by MSD for years. The FDA approval process has become increasingly difficult every year and the passage of time has made it more uncertain whether timely approval could be obtained. Furthermore, other companies have initiated the FDA IDE process for competing devices, making it unlikely that Dr. Braun's Invention could ever now be the first fusionless scoliosis device to be approved or the first to be marketed, as MSD had promised;

d.      Dr. Braun's development and commercialization of the Invention has been delayed for years and the value of the Invention's novelty has been diluted. Since the License Agreement was executed, others, including MSD, have had the benefit of

30

knowledge of Dr. Braun's work in the fusionless scoliosis area through the research and presentations he was obligated to undertake to discharge his own obligations under the License Agreement.  As such, others, including MSD itself, have had the opportunity to design around Dr. Braun's Invention and the narrow patent obtained by MSD, thus minimizing the value of Dr. Braun's Invention; and

e.    Dr. Braun has lost the other benefits he would have received under the License Agreement had MSD performed its obligations, including royalty payments, intellectual property rights, financial support for regulatory approvals of his Invention, increased reputation in his field, and other opportunities arising from the development and marketing of the Invention.

109.    In a letter dated March 30, 2010, Dr. Braun, through counsel, notified MSD of its breaches under the License Agreement and afforded MSD an opportunity to cure its breaches as the License Agreement contemplates.  MSD never responded substantively to Dr. Braun's notice and never attempted to cure its breaches under the License agreement.

110.    Dr. Braun is entitled to recover from MSD for these and all other damages caused by MSD's breach of the License Agreement in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF

**Breach of the Covenant of Good Faith and Fair Dealing (License Agreement)**

111.    Dr. Braun and MSD entered into a valid agreement for the license of Dr. Braun's Invention.

112.    In exchange for MSD's agreement to commit its resources to developing and obtaining regulatory approval for the Invention, and for royalty payments and other rights under the License Agreement, Dr. Braun granted to MSD, among other rights, a license to make and sell products using patent rights obtained based on Dr. Braun's Invention.

113.    The covenant of good faith and fair dealing carries with it an implied obligation to undertake all actions necessary to give effect to the promises made in the parties' agreement. MSD, however, breached the covenant of good faith and fair dealing in failing to undertake all actions necessary to perform several of its most critical promises in the License Agreement. These failures included, without limitation, failing to undertake all work predicate to preparing, filing, or conducting an IDE study with the FDA and to obtain PreMarket clearance from the FDA.

114.    The covenant of good faith and fair dealing also includes an implied covenant not to do anything to frustrate the objective of the parties' agreement or to injure the other party's rights to receive the benefit of the agreement.

115.    As described herein, MSD breached that covenant by, among other things, pursuing patent protection for the Invention in a manner that undermined Dr. Braun's reasonable expectations under the License Agreement and unjustly benefited MSD, and pursuing patents for other potentially competing devices and methods for treating spinal deformities without fusion while simultaneously ignoring Dr. Braun's Invention and assuring him that MSD was doing everything necessary to protect his interests.

116.    Under the License Agreement, MSD agreed to pursue patents for the Invention at its own expense using "sound and reasonable judgment" in a manner that would not undermine

32

Dr. Braun's reasonable expectations under the contract.

117.     Despite this representation and its obligation of good faith and fair dealing, MSD undermined Dr. Braun's rights under the License Agreement by unnecessarily delaying its prosecution of a patent, resulting in a seven-year lapse from the time the License Agreement was executed to the issuance of a patent.

118.     During that time, MSD misled Dr. Braun about the progress and the scope of the patent.  For example, on July 13, 2001, at the International Meeting on Advanced Spine Techniques ("IMAST") in the Bahamas, Dr. Braun told Serbousek, Medtronic's then-President of Technology Development, that he was going to disclose his Invention to the entire IMAST congress during a podium presentation that he was giving and he wanted to confirm that the patent had been filed before he made that disclosure.  Serbousek expressly told Dr. Braun that the patent application had been submitted, and thus Dr. Braun was free to disclose his Invention without concern that others would capitalize on his ideas.

119.     In October 2001, after Dr. Braun had publicly disclosed his Invention in reliance on MSD's representation that it had applied for a patent, Dr. Braun asked MSD employee Molz about the status of the Invention patent application so as to gauge the timing of the first office actions, set expectations and plan accordingly.  After several days of investigation, Molz told Dr. Braun that, in fact, the patent application on the Invention had not been submitted as Serbousek had represented.

120.     MSD did not even submit a provisional patent application for Dr. Braun's Invention until November 5, 2001, more than eighteen months after the parties' executed the License Agreement.  Significantly, MSD did not file this provisional patent application until a

33

month after the issuance of two of the fusionless patents that MSD applied for eight days before Dr. Braun disclosed the Invention to MSD.  MSD waited to file Dr. Braun's patent application in order to protect its own patents and limit the scope of subsequent patents, including Dr. Braun's.

121.  Indeed, although MSD had not applied for a patent for the Invention as it represented to Dr. Braun in July of 2001, Dr. Braun has subsequently discovered that MSD further continued to develop and seek intellectual property protection for its own devices related to the fusionless treatment of spinal deformities between the time that Serbousek had told Dr. Braun that MSD had filed a patent application for him and the actual filing date of that patent application in November 2001.  For example, on July 13, 2001--the very day that Serbousek had falsely represented to Dr. Braun that MSD had filed for his patent--MSD filed U.S. Patent No. #6616669 on a potentially competing method for treating scoliosis without fusion that included a tethering element (titled "Method for Correction of Spinal Deformities through Vertebral Body Tethering without Fusion").  MSD never disclosed that patent application to Dr. Braun.

122.  Furthermore, on September 28, 2001, MSD filed U.S. Patent Application No. 2002/0079636, titled "Shape Memory Alloy [Staple]."  Again, MSD did not disclose to Dr. Braun that during the time it was supposed to have filed for his patent, it was pursuing patents on this fusionless device even though the patent included a tethering element, which MSD had represented to Dr. Braun was a novel and unique feature of the Invention

123.  In addition to failing to timely seek patent protection for the Invention and misleading Dr. Braun about that failure, when MSD finally obtained a patent for the Invention, the patent was overly narrow, did not cover all of the Invention that Dr. Braun disclosed to MSD, and failed to cover some of the most valuable aspects of the Invention.

34

124.    MSD intentionally sought to minimize the scope of the Invention to be patented. MSD specifically advised Dr.Braun that references to aspects of tethering should be taken out of the patent strategy.  MSD imposed these limitations in order to reinforce and maximize its own ownership over tethering patents and to minimize Dr. Braun's.  MSD sought only to patent aspects of Dr. Braun's Invention that did not limit MSD's ownership of intellectual property and prospects for developing other devices elsewhere in the fusionless device area.

125.    MSD decided not to pursue all of the available protection for the Invention, including complete protection for all of the devices and methods of treating spinal deformities included in the Invention.  MSD chose only to pursue a patent that did not conflict with any of the other fusionless devices MSD was developing without Dr. Braun's knowledge.

126.    MSD's failure to pursue the broadest possible patent protection for Dr. Braun was inconsistent with its pre-contractual assurances of its intent to do just that.  MSD's failure left much of the Invention Dr. Braun disclosed unprotected.  Subsequently, MSD and others have sought to design around Dr. Braun's Invention, while plainly capitalizing on the concepts underlying the Invention that Dr. Braun disclosed to MSD and publicized in the public domain in connection with his responsibilities under the License Agreement.

127.    Indeed, in U.S. Patent No. 7,052,497, which MSD filed on August 14, 2002, MSD patented "Techniques for Spinal Surgery and Attaching Constructs to Vertebral Elements." That patent included surgical concepts Dr. Braun disclosed to MSD in connection with the License Agreement  and included drawings of applications of the patented technique that mirror embodiments of Dr. Braun's Invention.  MSD was unaware of those applications prior to Dr. Braun's disclosure of the Invention.  Dr. Braun's contribution to that patent was never

35

acknowledged and MSD never disclosed the existence of the patent to Dr. Braun.

128.    MSD knew that it was not fully protecting Dr. Braun's Invention.  In January of 2004, MSD's outside patent counsel forwarded to MSD an Office Action by the U.S. Patent and Trademark Office ("USPTO") requesting that MSD elect whether to pursue a patent covering the "method" for stabilizing the spine through the use of the anchor and tether together, or only a patent for the bone anchor.  MSD chose to pursue only the narrower device patent, with a promise to Dr. Braun that it would pursue other patents subsequently, which it never did.

129.    It is now clear, however, that MSD never had any intention of pursuing other aspects of patent protection for the Invention.  In fact, it is now apparent that MSD's patent strategies were intended to do as little as possible to Dr. Braun's interests with respect to development and commercialization of the Invention.

130.    Rather, MSD controlled and managed the patent process for the Invention in a manner intended to limit the scope of the patent claims so as not to impede development of MSD's own fusionless scoliosis devices and methods, which it never disclosed to Dr. Braun and pursued continuously at the expense of developing and commercializing the Invention.

131.    MSD's lack of good faith is evident in its November 23, 2008 letter to Dr. Braun proposing to terminate both license agreements and "reassign" to Dr. Braun the narrow patents that it had obtained for those devices in exchange for a "full and complete mutual release" of all claims arising from the agreements.

132.    In that letter, MSD also acknowledged the potential that Dr. Braun may "pursue the development of the intellectual property which is licensed to Medtronic under the Agreements with other parties."  MSD went on to advise Dr. Braun, however, that MSD "has

36

tether patents (including looped tethers) that predate your 1999 disclosure and [MSD] was active in this space prior to either of the Agreements." MSD also stated that it was "active in research and development in the entire fusionless space prior to involvement with you and we continue to be active in that space" and "we will remain actively engaged in that space and hope to launch products in this space in the near future."

133.    MSD's warning to Dr. Braun that it already had "tether patents" that predate Dr. Braun's disclosure amply demonstrates MSD's bad faith. If MSD owned tethering patents before Dr. Braun's disclosure of the Invention to MSD in 1999, then the covenant of good faith and fair dealing precluded MSD from using those patents in a way that would frustrate Dr. Braun's expectations under the Agreement. That is exactly what MSD did, however.

134.    MSD's reference to its tether patents was a direct acknowledgement of the significance of the tethering element in Dr. Braun's Invention and the fact that having a tethering element associated with the Invention was important to protecting all of the intellectual property included in the Invention. MSD had specifically represented to Dr. Braun that the tethering aspect of his Invention was unique. Nevertheless, MSD chose not to pursue patent protection for any aspect of either a tether device or the method of obtaining fusionless correction of spinal deformities disclosed in Dr. Braun's Invention. MSD did so in order to retain for itself as much ownership as possible of the intellectual property associated with the fusionless market and preserve for itself as many opportunities to exploit that market for its own benefit as possible-- even though such efforts would be at the expense of fulfilling promises made to Dr. Braun in the License Agreement.

37

135.   Failing to pursue patent protection associated with any aspect of the tether or method associated with the Invention also permitted MSD to leverage its ownership of tether patents to deter Dr. Braun from pursuing development and commercialization of the Invention elsewhere.

136.   MSD's disclosure to Dr. Braun in its November 2008 letter that it was on the cusp of launching new products in the "fusionless" space also demonstrates that MSD failed to perform in good faith.  MSD's development of devices to treat spinal deformities without fusion other than Dr. Braun's Invention are inconsistent with MSD's representations to Dr. Braun that developing his Invention would be MSD's priority, that MSD was performing as required under the License Agreement, and that its business strategies were targeted to achieve development of Dr. Braun's Invention.  In fact, MSD decided to go in a different direction while it was still obligated to perform the License Agreement.

137.   Despite its repeated representations of faithful performance under the License Agreement, MSD has actively pursued development of its own fusionless devices at the expense of its promises to Dr. Braun.  MSD has also made clear that it believes its own patents would preclude Dr. Braun's ability to commercialize the Invention elsewhere, even though MSD told Dr. Braun those aspects of the Invention were patentable and MSD failed to ensure the patents for Dr. Braun's Invention covered the entire Invention.

138.   MSD's decision to pursue and protect its own interests in developing and obtaining intellectual property protection for its own fusionless scoliosis devices, notwithstanding its obligation to Dr. Braun to do nothing to interfere with his reasonable expectations from the parties' agreement, plainly constitutes a breach of the implied covenant of

good faith and fair dealing.

139.   As a result of MSD's breach of the covenant of good faith and fair dealing by, among other things, failing to diligently pursue the most expansive intellectual property protection available for the Invention, Dr. Braun has been deprived of the benefits he reasonably expected to receive under the License Agreement.  He has suffered at least the following injuries:

a.   In reliance on MSD's representation that the Invention patent application had been submitted, Dr. Braun disclosed his Invention publicly without patent protection, allowing others to learn about and capitalize upon Dr. Braun's Invention and the science underlying the Invention;

b.   As a result of MSD's failure to pursue the broadest possible patent for the Invention and its seven-year delay in obtaining the patent, Dr. Braun was unable to develop and market his Invention, causing him to forego significant income, career advancement, and increased reputation in his field that he would have otherwise received.  MSD's delay and misrepresentations about the patent application also allowed others, including MSD, additional time to develop competing inventions;

c.   MSD's pursuit of a patent that does not fully cover Dr. Braun's Invention has allowed MSD and others to develop competing devices that are designed around the Invention patent.  Moreover, because Dr. Braun was diligent in performance of his obligations under the License Agreement to publish and present his research findings

associated with the Invention, MSD and others have had the opportunity to capitalize on

the science underlying Dr. Braun's Invention, while Dr. Braun himself has been deprived

of the opportunity to realize any of the benefits that would have accrued to him had MSD

acted in good faith under the License Agreement; and

        d.     MSD's failure to use sound judgment in protecting Dr. Braun's Invention

has deprived Dr. Braun of the benefits he reasonably expected under the License

Agreement, including royalties from the commercialization of the Invention, patent

protection for the full scope of the Invention, and other economic benefits that he would

have realized had MSD developed and marketed the Invention as promised.

     140.    Dr. Braun is entitled to recover from MSD for these and all other damages caused

by MSD's breach of the covenant of good faith and fair dealing in an amount to be determined at

trial.

### THIRD CLAIM FOR RELIEF

#### Breach of Contract (Concave Device Agreement)

     141.    The Concave Device License is a valid contract between SDGI and Braun LLC.

     142.    Braun LLC performed its obligations under the Concave Device License,

including providing required assistance and input related to the preparation, filing, and

prosecution of the patent described in the Concave Device License as required under Section 3.3

of that Agreement.

     143.    SDGI breached the Concave Device License by failing to pay Braun LLC the

$50,000.00 owed to it upon issuance of U.S. Patent No. 7,297,146 under the terms of the

Concave Device License.

144.    On April 22, 2010, Braun LLC notified SDGI of its failure to perform as required under the Concave License Agreement and provided SDGI a period of ninety days within which to cure its breach.  SDGI failed to do so.

145.    Braun LLC has been harmed by SDGI's breach and is entitled to payment of $50,000 plus interest as well as all other remedies provided to him by law and by the Concave Device License in light of SDGI's breach.

## FOURTH CLAIM FOR RELIEF

### (Common Law Unfair Competition)

146.    MSD misappropriated Dr. Braun's valuable intellectual property, information, and work product by misrepresenting that it would pursue development and patent protection of the Invention.  After inducing Dr. Braun to disclose the same, MSD merely sat on the Invention, while Dr. Braun remained bound by the License Agreement's terms and was prohibited from pursuing the development of the Invention elsewhere.

147.    Nevertheless, MSD continued actively to pursue development of its own fusionless devices that built upon Dr. Braun's disclosure of the Invention.  In doing so, MSD endeavored to develop and obtain intellectual property protection for its own fusionless surgical devices (that build upon Dr. Braun's Invention) for the purpose of precluding competitors, including Dr. Braun, from entering into the market.

148.    MSD has unfairly leveraged its ownership of the intellectual property rights in Dr. Braun's Invention to develop its own medical devices that misappropriate Dr. Braun's intellectual

41

property for uses other than development of the Invention, without compensating Dr. Braun for the right to do so.

149.    MSD has acted to stifle, rather than promote, the development of the Invention. MSD has done so to protect its interest in the potential development of fusionless devices that would compete with the intellectual property Dr. Braun licensed to MSD.  MSD has also done so to protect its interest in the lucrative market for devices used in scoliosis fusion surgeries, a market that MSD dominates.  Through its false representations, concealment of material facts, and refusal to return the full rights to the Invention to Dr. Braun, while simultaneously refusing to develop it, MSD has unfairly sheltered its position in the existing market for fusion instrumentation, bought itself valuable time to pursue its own fusionless devices, and guarded against the creation of a competitive market for fusionless scoliosis treatments that would jeopardize MSD's current market share in fusion instrumentation.  These actions resulted in a misappropriation of Dr. Braun's time, efforts, and intellectual property.

150.    Through its conduct and misrepresentations, MSD has seized for its own benefit the value of the Invention, which Dr. Braun has built up with his time and effort.  MSD can now use the information and rights it wrongfully obtained from Dr. Braun to develop devices that compete with Dr. Braun's Invention and/or preclude Dr. Braun and others from competing with MSD by enforcing intellectual property rights for ideas originally included in Dr. Braun's disclosure to MSD and assigned to MSD under the License Agreement.

151.    Dr. Braun has been injured by MSD's unfair competition in at least the following ways:

a.     MSD has frozen the development and commercialization of Dr. Braun's Invention.  MSD did this intentionally so that it could prevent the Invention from competing with MSD's own lucrative, but inferior, devices used in the surgical treatment of spinal deformities;

b.     As a result of MSD's unlawful misappropriation of Dr. Braun's valuable information, MSD has prevented Dr. Braun from developing and marketing the Invention for over ten years.  Due to that delay, Dr. Braun must now incur additional costs in developing the Invention, including funding and navigating the regulatory approval process;

c.     Dr. Braun must now contend with the fact that MSD is now asserting that its own patents that it obtained prior to, and after, Dr. Braun's disclosure to MSD in 1999 may preclude Dr. Braun's development of the Invention elsewhere;

d.     Because MSD wrongly froze the development of Dr. Braun's Invention, even if all of the rights in the Invention were returned to him so that he could pursue the development of the device through one of MSD's competitors, the Invention would not have the same value in the market today as when initially disclosed.  Indeed, the passage of more than a decade since the Invention was first disclosed to MSD has diluted the value of the Invention, bought time for MSD to pursue its own fusionless device patents, and has permitted others, including MSD, to learn from Dr. Braun's groundbreaking scientific work while designing around the narrow patent that MSD obtained.  Such

43

damage would not exist if MSD had not misappropriated Dr. Braun's valuable intellectual property; and

      e.     Dr. Braun and any new licensee with whom he may contract, must also confront the risk that MSD or others have patented or will patent devices and methods based on the information that MSD wrongfully misappropriated from Dr. Braun, preventing Dr. Braun from benefiting from his own intellectual property.

152.    By misappropriating Dr. Braun's ideas, MSD has benefited by eliminating a potential competitor and by obtaining information that it can use to develop its own products or to exclude other competitors, thus sustaining and increasing its dominant position in the market for the treatment of scoliosis.

153.    Dr. Braun is entitled to recover damages for these and all other injuries caused to him by MSD's unfair competition in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF

#### (Unjust Enrichment)

154.    Dr. Braun conferred a benefit on MSD by disclosing his confidential and valuable ideas and work product relating to the Invention and other concepts.

155.    MSD appreciated and accepted that benefit under circumstances that make it unjust for MSD to retain that benefit without payment for its value.

156.    Specifically, MSD obtained Dr. Braun's confidential disclosure of his Invention by representing that it would work to market and develop the Invention, including obtaining patent protection for the Invention.