# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| JOHN T. BRAUN, MD | **RULING & ORDER** |
| Plaintiff, | Case No. 2:10-CV-1283 |
| v. | United States District Court Judge Robert Shelby |
| MEDTRONIC SOFAMOR DANEK, INC., | |
| Defendants. | Magistrate Judge Dustin Pead |

Oral argument was held on December 6, 2012, at the conclusion of which the court took the following matters under advisement: (1) Plaintiff John T. Braun's (Dr. Braun) Motion To Compel Defendant Medtronic Sofamor Danek (Medtronic) to respond to specific interrogatories and document requests (Document Number 63); (2) Medtronic's Motion For Leave To File Counterclaim and Second Amended Answer (Document Number 66);[1] (3) Dr. Braun's Motion For Protective Order (Document Number 90); (4) Medtronic's Motion To Expedite Motion For Leave To Depose Maira Newell (Document Number 116); and (5) Dr. Braun's Second Motion To Compel Discovery (Document Number 108).  Having thoroughly considered the parties' argument, briefing and the relevant legal authorities, the court now rules as follows.

## I.  Dr. Braun's Motion To Compel

Federal Rule of Civil Procedure 26(b)(1) defines the scope of discovery as "any

---

[1]At oral argument, Dr. Braun requested an opportunity to file a sur-reply to Medtronic's Motion For Leave To File Counterclaim and Second Amended Answer (Document Number 66). In a docket text order, dated December 7, 2012, the court granted Dr. Braun's request (Document 138).  On December 18, 2012, the court received Dr. Braun's sur-reply and has reviewed the arguments presented prior to ruling herein (Document Number 143).

nonprivileged matter that is relevant to any party's claim or defense– including the existence,

description, nature, custody, condition and location of any documents or other tangible things and

the identity and locations of persons who know of any discoverable matter."  Fed. R. Civ. P.

26(b)(1).  Further, "[f]or good cause, the court may order discovery of any matter relevant to the

subject matter involved in the action.  Relevant information need not be admissible at the trial if

the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  *Id.*

Relevant information is defined as "any matter that bears on, or that reasonably could lead to

other matter[s] that could bear on, any issue that is or may be in the case."  Oppenheimer Fund,

Inc. v. Sanders, 437 U.S. 340, 351 (1978)).   When resolving discovery disputes, courts are

charged with balancing the discovery of relevant[2] information with the fact that "discovery, like

all matters of procedure, has ultimate and necessary boundaries."  *Id.* at 351 (citing Hickman v.

Taylor, 329 U.S. 495, 507 (1947).

    Here, the crucial issue is the appropriate scope of the disputed interrogatories and

requests for production.  On one hand, Dr. Braun requests the court paint a broad stroke and

allow for the discovery of information related to every physicians' development and licensing

agreements with Medtronic.  Dr. Braun claims that such a comprehensive scope is necessary in

order to establish Medtronic's "pattern and practice" of entering into license agreements with the

intent to secure loyalty and thereby deter physicians from pursuing their developments with other

companies.  Medtronic, on the other hand, argues for a more narrow scope of discovery,

suggesting that the court should limit discovery to information that is similar to Dr. Braun and

---

[2]"[T]he court should and ordinarily does interpret 'relevant' very broadly to mean matter
that is relevant to anything that is or may become an issue in the litigation."  4 J. Moore, Federal
Practice ¶ 26.56 [1], p. 26-131 n. 34 (2d ed. 1976).

his fusionless scoliosis device.

Generally speaking, and as discussed more fully below, while making no determination as to the admissibility of incidents involving other physicians and devices, the court recognizes the relevance in allowing Dr. Braun to obtain discovery regarding similarly situated individuals and devices.  *See* Donovan v. Wal-Mart Stores, Inc., 2012 WL 3025877 *2 (D.S.C.) (finding plaintiffs discovery requests "should be more reasonably tailored to include only those incidents which are similar to the incident at issue in the case").  Consistent with the parties' submissions, the court has divided the requested information into five main categories.  Each category and the specific discovery requests related thereto are addressed below.

### 1.  Information Related To Other Physicians:  Interrogatory Numbers 1, 12 and Requests For Production 16, 17, 18, 19 and 73.[3]

**\*Interrogatory Number 1.[4]**

Interrogatory Number 1 seeks the information regarding contracts between Medtronic and all physicians for the development of any medical device, along with additional information, including, but not limited to, the name of the physician, description of the device, date of contract, date of patent application and date of first commercial sale.  In response, Medtronic provided responsive information regarding Dr. Braun and is in the process of producing similar information as it relates to Dr. Ogilvie and his straight tether and pedicle screw concepts.

---

[3]Dr. Braun's motion to compel indicated there was a dispute surrounding Request For Production 15.  At oral argument, Medtronic informed the court that it had provided the requested information and therefore Request For Production 15 was no longer in dispute.

[4]Interrogatory Number 1 seeks the identity of all contracts for the development, licensing, and/or marketing of any Medical Device that Medtronic entered into with any physician during the period 1999 until the present (Document Number 64-2).

Medtronic objects, however, to the remainder of the request arguing that it is overly broad and encompasses information not relevant to Dr. Braun's case.

While the court understands the basis for Dr. Braun's request and his interest in reviewing records and agreements with other physicians in order to bolster his own claims, the Court finds that, as drafted, this interrogatory is overbroad and not reasonably tailored to the discovery of relevant information.  In other words, even assuming that Dr. Braun's request has arguable relevance to his allegations, the Court must also consider whether the request is proportional; that is, whether the breadth and expense of the request is carefully measured and narrowly tailored to meet the stated goal.  *See* Palgut v. City of Colo. Springs, 2007 U.S. LEXIS 6212 *2 (citing, Simpson v. University of Colo., 220 F.R.D. 354, 356 (D. Colo. 2004) ("a party's right to obtain discovery. . . may be constrained where the court determines that the desired discovery is unreasonable or unduly burdensome given the needs of the case, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.")). The Court concludes that it is not.  As drafted, this interrogatory requires Medtronic to identify every single contract it has entered into with *any* physician for the development of *any* medical device.  In doing so, Dr. Braun fails to direct the Court to sufficient evidence, or inferences, that lead to the conclusion that the request, as drafted, is proportional to the costs associated with compliance.

Accordingly, Dr. Braun's motion to compel is granted in part, as to Interrogatory Number 1.  Medtronic is required to provide, as agreed, responsive information related to Drs. Braun and Ogilvie, as well as responsive information identifying all contracts between Medtronic and physicians involved in the fusionless treatment of scoliosis and spinal implant devices.

4

**\*Interrogatory Number 12.[5]**

Through this interrogatory, Dr. Braun seeks information as to the average amount of time

between the date Medtronic licenses a medical device and its first date of commercial use.

Medtronic provided responsive information regarding the Shilla Device[6], but otherwise claims it

does not track this type of information.

The Court concludes that this interrogatory can and should be reasonably tailored to

include information similar to this facts and circumstances of Dr. Braun's case.  As a result, the

court grants the motion to compel, in part, requiring Medtronic to provide the requested

information, to the extent that Medtroinc records such dates and times, pertaining only to

Medtronic's fusionless socliosis and spinal implant device technologies.

**\*Requests For Production 16 through 19.[7]**

Requests for production 16 through 19 generally seek the production of documents

_____

[5]Interrogatory Number 12 requests information from 1990 to 1999 on the average amount of time between the date when Medtronic either invented and/or licensed a medical device and the first date of commercial use of such device (Document Number 64-2).

[6]The Shilla Device is a fusionless scoliosis device approved for use in Europe.  It has not been approved by the FDA for use in the United States.

[7]Request For Production 16 seeks the production of "all documents concerning Medtronic's efforts [to] market its products to spinal surgeons in the Intermountain West (Utah, Nevada, Idaho, Colorado, Wyoming) for the period 1999 to 2003.  Request For Production 17 seeks the production of all documents concerning Medtronic's "efforts or intentions to expand the market for its surgical devices" though research, development and licensing from 1997 to the present.  Request For Production 18 seeks the production of documents concerning studies that Medtronic commissioned or performed related to "techniques for effectively marketing to physicians" for the period 1995 to 2008.  Request For Production 19 seeks all documents reflecting Medtronic's "plans to expand its market share by identifying and marketing products to physicians that Medtronic had identified as potentially influencing the medical device choices of other surgeons." (Document Number 64-2).

related to Medtronic's marketing and plans to expand its market share.  Medtronic has limited its production to marketing efforts related to Dr. Braun and has not produced any documents related to its marketing regarding other physicians.

The Court concludes that these requests for production should be more narrowly tailored and therefore grants the motion to compel, in part, limiting production to documents related to Medtronic's marketing to physicians involved in fusionless scoliosis and spinal implant devices.

**\*Request For Production 73**.[8]

This request seeks all Medtronic's royalty and license agreements relating to fusionless socliosis device technologies.  In response, Medtronic has produced the requested information related to Dr. Braun and indicates that it will produce all relevant agreements between Medtronic and Dr. Ogilvie.

The Court finds that this request for production is relevant to Dr. Braun's claims and may lead to admissible evidence.  Further, the request is properly tailored requiring Medtronic only to provide royalty and license agreements relating to fusionless scoliosis device technologies.  Accordingly Dr. Braun's motion to compel is granted as to this request for production.

### 2.  Information Related To Medtronic's Development of Other Devices: Interrogatory Number 9.[9]

Dr. Braun asserts that information related to the development of other devices is relevant

---

[8]Request For Production 73 requests the production of "any and all royalty agreements (proposed or actual) between Medtronic and any party relating to fusionless scoliosis device technologies."  (Document Number 64-2).

[9]Dr. Braun's motion to compel indicated there were disputes surrounding Interrogatories 3, 4 and 8 and Request For Production 3.  At oral argument, Medtronic informed the court that it had provided the requested information and that those interrogatories and request for production were no longer in dispute.

to show Medtronic's "pattern and practice" of entering into licensing agreements with physicians in order to secure customer loyalty and prevent physicians from developing competing devices. Dr. Braun supports his claims by citing to the testimony of former Medtronic physician, Dr. James Ogilvie, as well as "documented disputes" between Medtronic and the Justice Department involving allegations that Medtronic "used consulting, licensing and royalty agreements to pay 'kickbacks' to doctors in exchange for the doctors' loyalty to [Medtronic] products." (Document Number 64). Medtronic counters that the scope of Dr. Braun's discovery requests must be narrowly tailored to only those medical devices that are "truly similar" to Dr. Braun's fusionless scoliosis device.

As addressed in connection with the discovery of information pertaining to other physicians, the court finds that any information sought regarding other medical devices must not only be relevant, but also sufficiently measured and tailored to meet the stated goal.

**\*Interrogatory Number 9.**[10]

Interrogatory Number 9 seeks identification of the "average retail cost" of the medical instrumentation used in a "typical spinal fusion surgery" using Medtronic instrumentation. Medtronic responded to the interrogatory by providing sales information for its fusion instrumentation.

The court denies Dr. Braun's motion to compel given the inherent vagaries in the term "retail cost" and Medtronic's assertion at oral argument that it does not possess and cannot identify retail cost information. Accordingly, the motion is denied as it relates to this

---

[10]Interrogatory Number 9 requests identification of the "average retail cost" of the medical instrumentation used in a "typical spinal fusion surgery using Medtronic instrumentation." (Document Number 64-2).

interrogatory.

### 3. Information Related to Mario Kuzio's Employment File:  Request For Production 37.[11]

Through this request for production, Dr. Braun seeks the personnel file of former Medtronic Vice-President of Sales, Mr. Mario Kuzio (Mr. Kuzio).  Dr. Braun contends that Mr. Kuzio played a key role in inducing him to sign his licensing agreement with Medtronic.  As a result, Dr. Braun assert that Mr. Kuzio's personnel file is relevant because it is likely to contain evidence of Mr. Kuzio's authority to make representations and inducements to physicians, as well as the specific reasons for his termination from employment with Medtronic.  Medtronic counters that Dr. Braun's employment file is not relevant to the claims in this case and that the requested information may be obtained through other means.

The court agrees with Medtronic concluding that while the statements or representations that Mr. Kuzio allegedly made to Dr. Braun may be relevant and discoverable, Mr. Kuzio's entire employment file is not.  Similarly, the fact that Mr. Kuzio is no longer employed at Medtronic and does not object to the disclosure of his employment file does not automatically make the file itself discoverable.  The information that Dr. Braun currently seeks may be obtained through the deposition of Mr. Kuzio or his supervisors at Medtronic and therefore the motion to compel is denied as to this request for production.[12]

––––––––––––––––––––

[11]Request For Production 37 seeks "all documents concerning Mario Kuzio's employment with Medtronic, including but not limited to his complete personnel file." (Document Number 64-2).

[12]At oral argument, Dr. Braun indicated that he had taken the deposition of Mr. Kuzio, after which he concluded that there may be additional information in Mr. Kuzio's employment file that Mr. Kuzio himself was not aware of and therefore was unable to testify to.  The court, however, is not convinced that the information relevant to Dr. Braun's claims can not be

**4.   Documents Related To Medtronic's Pursuit Of Patents:   Requests For Production 11, 12, 53, 59, 60, 61, 62 and 63.**

Through these requests, Dr. Braun seeks information related to any actual patents that Medtronic has or pursuits that it has made to patent fusionless scoliosis devices.  Dr. Braun asserts documents related to other patents are relevant in light of Medtronic's application for four fusionless device patents eight days prior to Dr. Braun's disclosure of his own invention to Medtronic.  Additionally, Dr. Braun contends that information related to other patents will show that instead of honoring its obligations to Dr. Braun, Medtronic "filed patent applications for and pursued other devices for fusionless treatment of scoliosis that design around and incorporate aspects of Dr. Braun's Invention." (Document Number 64).

In response, Medtronic asserts that it has produced all information regarding the patents for Dr. Braun's concept, as well as the patent history file for patent number 7,052,497.[13] Medtronic has not produced information regarding other patent applications because the other four applications to which Dr. Braun specifically refers were filed prior to Dr. Braun's disclosures to Medtronic, and are therefore not relevant to Dr. Braun's current claims.  Medtronic indicates that it has provided sufficient information regarding its fusionless patents in order to allow Dr. Braun to obtain all publically available documentation and information for the devices.

The court recognizes Dr. Braun's interest in information he believes is relevant and will bolster his claims against Medtronic for breach and failure to pursue patent protection for his

---

discovered through the depositions of Mr. Kuzio and his supervisors at Medtronic.

[13]Dr. Braun contends that patent number 7,052,497, filed on August 14, 2002, as "Techniques for Spinal Surgery and Attaching Constructs to Vertebral Elements" incorporates aspects of his own concepts.  (Document Number 1).

device in order to leverage ownership of other similar patents and deter Dr. Braun from pursing

development of his device elsewhere (Document Number 64).  For purposes of discovery,

however, the information sought must not only be relevant, but also sufficiently measured and

narrowly tailored to meet the stated goal.  Consistent therewith, the court does not find

information pertaining to anything other than Medtronic's fusionless device patent applications,

filed after Dr. Braun entered into the licensing agreement with Medtronic, to be relevant.  Given

the claims at issue in this case, to require otherwise would be unreasonable and unduly

burdensome.

**\*Request For Production 11.[14]**

This request seeks production of all documents concerning Medtronic's fusionless patents

including patent applications, provisional patents, correspondence with the United States Patent

and Trademark Office, date of invention and all documents related to the prosecution of the

patent.  In response, Medtronic produced information relating to Dr. Braun's concept as well as

the patent history file for patent number 7,052,497.  As to communications and documents

relating to the other patents, Medtronic indicates that it has provided information sufficient to

allow Dr. Braun to obtain all publicly available information.

The court grants this request in part, requiring the production of documents concerning

Medtronic's fusionless device patents and patent applications obtained after Dr. Braun entered

into his licensing agreement with Medtronic on April 1, 2000.

---

[14]Request For Production 11 seeks all documents concerning Medtronic's Fusionless
Patents.  (Document Number 64-2).

**\*Request For Production 12.[15]**

Dr. Braun seeks all documents concerning research and development for Medtronic's Fusionless Devices.  Medtronic has limited its production to documents relating to Dr. Braun's concepts and the prosecution history file for patent number 7,052,497**.**

The court grants this request in part, requiring the production of all Medtronic's fusionless device research and development documents after April 1, 2000–the date when Dr. Braun entered into his licensing agreement with Medtronic.

**\*Request For Production 53.[16]**

This request seeks all documents concerning the device described in patent number 7,052,497 including all communications and other documents regarding its development and design.  Medtronic indicates that it has produced the patent prosecution history file related to this patent, but objects to the provision of internal documents and communications.

The court concludes that this request seeks relevant information and is narrowly tailored to meet the stated goal.  Accordingly, the court grants Dr. Braun's motion to compel as to all non-privileged documents requested for production, relevant to patent number 7,052,497.

**\*Requests For Production 59 through 63.[17]**

---

[15]Request For Production 12 seeks the production of all documents "concerning research and development for Medtronic's Fusionless Devices. . ." (Document Number 64-2).

[16]Request For Production 53 seeks "all documents concerning the device described in U.S. Patent No. 7,052,497, including, but not limited to, all communications and other documents concerning its development and/or design."  (Document Number 64-2).

[17]Requests For Production 59 through 63 seek the production of all documents concerning devices described in U.S. Patent Numbers 6,616,669, 6,324,805, 6,299,613, 6,296,643 and 6,436,099 (Document Number 64-2).

Dr. Braun seeks all documents concerning the devices described in Patent No. 6,16,669, 6,342,805, 6,299,613, 6,296,643 and 6,436,099.  Medtronic has provided Dr. Braun with information sufficient to obtain all publically available information related to these patents.

The Court grants Dr. Braun's motion to compel in part, as to all non-privileged documents requested for the patents listed above, to the degree that they involve Medtronic's fusionless devices and were obtained after Dr. Braun entered into his licensing agreement with Medtronic on April 1, 2000.

### 5. Medtronic's Financial Documents: Request For Production 1[18]

Dr. Braun's request seeks all documents concerning finances for Medtronic's do ydospinal division.  Dr. Braun contends that the requested financial information is directly relevant to his claim for damages and necessary in order to analyze Medtronic's profits and identify how Dr. Braun's device would have affected profit calculations.  In response, Medtronic asserts that Dr. Braun's request is overbroad because its spinal division encompasses a wide range of products and technologies (e.g. interspinous spacers, spinal cord neurostimulators, balloon kyphoplasty) that are not relevant to the fusionless treatment of scoliosis.

The Court agrees with Medtronic and finds this request to be overbroad.  As drafted, the request seeks the production of all Medtronic's spinal division financial information starting at the lowest level of account detail available including income statements, balance sheets, general

---

[18]Request For Production Number 1 seeks "all audited and unaudited financial statements for Medtronic for the period 1999 to 2011 at the lowest level of account detail available, including but not limited to all income statements, balance sheets, general ledgers, and transaction reports.  Produce all annual income statements (at the lowest account level possible as contained in Medtronic's general ledger) for the business unit containing Medtronic's fusionless scoliosis devices from 1999 to present."  (Document Number 64-2).

ledgers and transaction reports.  Dr. Braun's concepts at issue in this case concern a discrete

subsection of the spinal division—the fusionless treatment of scoliosis.  Accordingly, Dr.

Braun's motion to compel is granted in part and Medtronic is required to produce budgets,

forecasts, sales information and financials for all of its fusionless projects and devices.  This shall

include, but is not limited to, projected sales and expenses for the Shilla device as well as all

sales information for spinal devices including the CD Horizon Legacy Spinal System.

Finally, while the issue of attorney fees and costs incurred in responding to discovery has

been raised by the parties, the court finds this issue to be premature and declines any invitation to

address the matter at this time.

Accordingly, for the reasons now stated herein, Dr. Braun's Motion To Compel is

GRANTED as to Request For Production 73 and Interrogatory Number 53, the Motion To

Compel is GRANTED IN PART as to Interrogatory Numbers 1 and 12 and Requests For

Production 1, 11, 12, 16, 17, 18, 19,59, 60, 61, 62 and 63 and the Motion To Compel is DENIED

as to Interrogatory Number 9 and Request For Production 37.

## II.  Medtronic's Motion For Leave To Filed Counterclaims & Second Amended Complaint

Dr. Braun worked as an employee of the United States Air Force (the Air Force) from

1995 through his honorable discharge on September 30, 1999.  As part of his official duties, Dr.

Braun studied the efficacy of implanting a nitinol staple into the spine for the fusionless

treatment of scoliosis (Document Number 67).

On October 1, 1999, at 12:01 a.m., the day immediately following Dr. Braun's discharge

 from the Air Force, Dr. Braun recorded on paper for the first time his inventions (Inventions)

developed for the fusionless treatment of scoliosis---a bone anchor in connection with a looped

13

tether (Document Number 110).  Several days later, Dr. Braun entered into a Mutual

Confidentiality Agreement with Medtronic under which Dr. Braun represented that he was the

"lawful owner" of the Inventions and that his disclosure to others did not "violate the rights of

any third party." (Document Number 110-6).  Thereafter, on April 1, 2000, Dr. Braun entered

into a License Agreement with Medtronic warranting that he was "the exclusive owner or joint

owner with [Medtronic] of all right, title and interest in and to the Licensed Patents." (Document

Number 110-7).

Based on this set of events and pursuant to Federal Rule of Procedure 15(a), Medtronic

now seeks leave of court to amend its answer in order to add defenses and counterclaims

addressing the ownership of Dr. Braun's Inventions.[19]  Specifically, Medtronic contends that

because Dr. Braun conceived his Inventions while in the Air Force, when Medtronic entered into

the licensing agreement with Dr. Braun, it was actually the Air Force, and not Dr. Braun, who

legally owned the Inventions.  Dr. Braun disagrees with the Medtronic's claim and opposes

amendment on the grounds that the request is untimely, Medtronic knew or should have known

of the facts related to its proposed amendment and amendment would be futile because

Medtronic can not stand in the shoes of the Air Force to assert its ownership (Document

Numbers 92, 1).

---

[19]Medtronic proposes two new defenses:  Defenses 38 and 39.  Defense 38 asserts that Dr.
Braun's claims are barred because of the breach of express warranties with Medtronic.  Defense
39 asserts that Dr. Braun did not own the rights to the concepts he disclosed to Medtronic.
Medtronic also seeks leave to file three new counterclaims for:  (1) breach of express warranties
because the Air Force, and not Dr. Braun, owned the Inventions at the time Dr. Braun licensed
them to Medtronic, (2) Declaratory Judgment finding that the Air Force, and not Dr. Braun, is the
lawful owner of the Inventions; and (3) Declaratory Judgment finding that there has been a
failure of consideration under the parties' license agreement because the Air Force, and not Dr.
Braun, owns the Inventions  (Document Number 92).

Once a pleading is served in response to a complaint, a party may amend its pleading with "the opposing party's written consent or the court's leave" and the "court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a).  A court's denial of leave to amend is generally justified only upon a showing of  "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962); See Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993).

**Untimeliness & Delay**

Courts have found that "untimeliness alone is a sufficient reason to deny leave to amend." Frank v. U.S. West, Inc., 3 F.3d 1357, 1365-66 (10th Cir. 2003) (citations omitted); See First City Bank, N.A., 820 F.2d 1127, 1133 (10th Cir. 1987) (a court "acts within the bounds of its discretion when it denies leave to amend for 'untimeliness' or 'undue delay' " ).  Moreover, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." Frank, at 1365-66.  Cf. Smith v. Aztec Well Servicing Co., 462 F.3d 1274, 1285 (10th Cir. 2006) (internal quotation and citation omitted) ("When determining whether a newly raised claim is untimely under Rule 15(a), [t]his Circuit. . . focuses primarily on the reasons for the delay. We have held that denial of leave to amend is appropriate when the party filing the motion has no adequate explanation for the delay.")); See Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990).

Dr. Braun argues that Medtronic's motion to amend is untimely because it has been six

months since the amended pleading deadline passed.  Additionally, Dr. Braun asserts that

Medtronic has known of the facts and circumstances supporting its request for amendment since

1999, because while serving in the Air Force, Dr. Braun's scoliosis work was "done for

Medtronic's benefit and at its expense." (Document Number 92).  Medtronic counters that it was

not aware of the issues surrounding the Air Force's ownership of Dr. Braun's Inventions until

August 9, 2012, when through discovery it received Dr. Braun's handwritten notes containing

evidence that his Inventions were created during the period when Dr. Braun was on active duty

(Document Number 110).  Shortly after its receipt of the notes, Medtronic filed its motion for

leave to amend on September 20, 2012 (Document Number 66).

 Upon consideration, the court finds Dr. Braun's argument that Medtronic knew or should

have known of Dr. Braun's work while he was on active duty in the Air Force to be compelling

(Document Number 143).  The claim that Medtronic had knowledge of Dr. Braun's work is

bolstered by the deposition of Troy Drewry, Senior Product Development Engineer at Medtronic.

In his deposition, Mr. Drewry indicated that he realized Dr. Braun was in the military when he

traveled to the Air Force military base in Texas to meet with Dr. Braun at the animal laboratory

where Dr. Braun was overseeing fusionless work (Document Number 110; Deposition of Troy

Drewry, Document Number 147-6).  Furthermore, on September 30, 1999, the day that Dr. Braun

was honorably discharged from the Air Force, Mr. Drewry sent Dr. Braun a letter stating that he

was "impressed with the results of his animal studies" and that he had informed Dr. Ogilvie that

Dr. Braun was "interested in continuing this work at the University of Utah."  (Document

Number 110; Letter from Troy Drewry, Document 147-7).  Mr. Drewry also provided Dr. Braun

with a design notebook, presumably to document inventions for disclosure to Medtronic, and

indicated that Medtronic was "looking forward to hearing ideas and moving forward with all of our future endeavors." (Document Number 110; Letter from Troy Drewry, Document 147-7).

Thus, despite Medtronic's assertion that was only through the discovery process that it became aware of the Air Force ownership claims,[20] the inferences that must be drawn from the parties' documented communications and interactions, as referenced above, are that Medtronic knew or at least should have known as of September 1999 of Dr. Braun's work in the Air Force. While the court shares some wariness regarding Dr. Braun's 12:01 a.m. epiphany the morning after his discharge, the inferences stemming therefrom should have at that time prompted Medtronic's awareness of the ownership issues. Therefore, the court finds that even though Medtronic asserts that it had no knowledge of Dr. Braun's work while in the Air Force, Medtronic clearly should have known of his Air Force work long before the September 20, 2012, date it filed its request for amendment.[21]

Accordingly, for these reasons, the court finds Medtronic's Motion For Leave to Amend to be untimely and it is hereby DENIED.

---

[20]Of note, it appears there is no demonstrable link between Dr. Braun's undated handwritten notes and his time in the Air Force (Document Number 110).

[21] While denying the motion based on untimeliness, the court notes that Dr. Braun also argues that amendment would be futile since, absent strict adherence to the procedures required to determine government ownership of employee intellectual property, Medtronic has no right to stand in the Air Force's shoes and assert that the Air Force, as a non-party, owns Dr. Braun's Invention (Document Number 92). While the court denies amendment based on untimeliness, and therefore does not reach the merits of Dr. Braun's futility claim, the court notes that a motion for leave to amend may be denied based upon futility when "the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment." Bradshaw v. Lappin, 2012 WL 2045762 *6-7 (10th Cir. June 7, 2012) (citing Bauchman ex rel. Bauchman v. W. High Sch., 132 F.3d 542, 562 (10th Cir. 1997)).

### III. Dr. Braun's Motion For Protective Order Against Subpoena To Maira Newell

On September 21, 2002, Medtronic issued a Notice of Subpoena duces tecum[22]

on Maira Newell (Ms. Newell), Dr. Braun's secretary and research assistant at the University of

Vermont and the University of Utah (Document Number 91).  While Dr. Braun's employment

with the University of Vermont ended in early 2012, Ms. Newell remains currently employed at

the university (Document Number 104).

Dr. Braun raises several objections to the third-party subpoena served on Ms. Newell,

---

[22] The subpoena commands Ms. Newell to produce:

All email communications (with any accompanying attachments) in your possession or control for the period from January 1, 2000 to the present in which John Braun is the sender, an addressee, a cc or in which his name is referenced or mentioned.

All documents constituting, reflecting or referring to communications (with any attachments or enclosures) between you, on the one hand, and John Braun, on the other hand, during the period from January 1, 2000 to the present.

All documents containing or referencing findings, results, conclusions, notes, action items, solutions or hypotheses arising out of or related to animal studies conducted in whole or part by Dr. John Braun during the period from October 1,1999 to the present.

All documents referencing or relating to "tenure," termination or cessation of employment or suspension of any privileges of John Braun with either the University of Utah, the University of Vermont, any hospital or any medical clinic.

All documents constituting, referring to or relating to claims or potential claims of John Braun against Medtronic Sofamor Danek, Inc. or SDGI Holdings, Inc. or Warsaw Orthopedics.

All documents concerning any claims alleged by Dr. John T. Braun in his complaint against Medtronic Sofamor Danek, Inc. filed in the United States District Court for the District of Utah, Civil No. 2:10-CV-1283.

18

arguing that it improperly requires the production of documents beyond Ms. Newell's control, requests the disclosure of privileged and protected documents and seeks documents protected under the Health Insurance Portability and Accountability Act (HIPPA).

As an initial matter, pursuant to Federal Rule 34(a), a party may serve another party with a request "(1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody or control. . ." Fed. R. Civ. P. 34(a). Documents are considered to be in a third party's "control" when the third party has the ability to obtain the documents. *See* S2 Automation LLC v. Micron Tech., Inc., 2012 U.S. Dist. LEXIS 120097 *53 (D.N.M Aug 9, 2012) (citations omitted) ("Control comprehends not only possession, but also the right, authority or ability to obtain the documents."). "Courts will find documents to be within a party's control if the party has actual possession, custody, control, or the legal right to obtain the documents on demand. Courts will also find that documents are within a party's control when it has the . . . practical ability to obtain the documents, particularly when the opposing party does not have the same practical ability to do so." *Id.* at *53 (internal quotations and citations omitted); *See also* R.F.M.A.S., Inc. v. So., 271 F.R.D. 13, 24 (S.D.N.Y 2010) ("Evidence in a party's 'control' has been interpreted to mean evidence that the party has the legal right, authority or practical ability to obtain by virtue of its relationship with the party in possession of the evidence")). Here, while issues of HIPPA, privilege and work product are relevant and ultimately limit the scope of production, the court finds that the subpoena itself is appropriate to the extent that Ms. Newell has the practical ability and authority to obtain relevant and discoverable information.

Setting aside the issue of Ms. Newell's control over the documents, Dr. Braun also raises

19

several relevant concerns surrounding the scope of the subpoena, the implications of the attorney client privilege, HIPPA and the interests of the University of Vermont in the requested documentation.  Taking into account these issues, the  Court now rules as follows and grants Dr. Braun's motion in part, and denies it in part, as stated:

1. The protective order is granted to the extent that the subpoena seeks documents containing information protected by HIPAA.[23]

2.  The protective order is denied as to non-privileged, relevant documents in Ms. Newell's possession.  While the Amended Scheduling Order[24] absolves the parties from providing a privilege log, the Order does not relieve the parties of their obligation to indicate the documents for which it claims a privilege or protection.  *See* Foster v. Hill, 188 F.3d 1259, 1264 (10th Cir. 1999); Flying J Inc. v. TA Operating Corp., Case No: 1:06-cv-30, 2007 U.S. Dist. LEXIS 55574, at *9 (D. Utah July 30, 2007) ("[P]rivilege must be established on a document by document basis. The mere naked claim of privilege does not justify a refusal to identify or produce the information and documents requested.")).

3.  The University of Vermont indicates that it has no interest in those documents that pre-date Ms. Newell's employment with the university, or those documents that have always

---

[23]Dr. Braun asserts that he is a "covered entity" under HIPAA and must safeguard individually identifiable health information from unauthorized use and disclosure of protected health information.  *See* 45 C.F.R. § 164.508.

[24] The Amended Scheduling Order provides that a privilege log is unnecessary as to " 1) privileged communications relating solely to the prosecution or defense of this lawsuit occurring between the parties' outside counsel of record and a client and/or; 2) work product created by outside counsel of record (or at counsel's direction) relating solely to the prosecution or defense of this lawsuit, regardless of when such communications occurred or when such work product was created."  (Document Number 55).

been in her personal possession (November 9, 2012 email from Tom Mercurio).  The university

does, however, express an interest in those documents pertaining to individual students, research

subjects, or issues that directly implicate the university itself.  Accordingly, the university shall

have an opportunity to review the requested documentation and advise the parties of any

concerns related thereto.

## IV.  Medtronic's Motion To Expedite Motion For Leave To Depose Maria Newell

On September 28, 2012, Medtronic served a subpoena duces tecum on Maria Newell, Dr.

Braun's secretary and research assistant at the University of Vermont and the University of Utah.

Medtronic also served Ms. Newell with a deposition subpoena scheduled to take place on

October 29, 2012, prior to the conclusion of the fact discovery deadline set for November 30,

2012.  On October 10, 2012, Dr. Braun filed his motion for a protective order regarding the

deposition of Ms. Newell (Document Number 90).  As a result, Medtronic contends it was unable

to take Ms. Newell's deposition prior to the close of discovery and requests leave to conduct the

deposition after the fact discovery deadline (Document Number 117).

Dr. Braun objects to an extension of time for Medtronic to depose Ms. Newell, arguing

that Medtronic exhibited a lack of diligence in failing to resolve the matter prior to the fact

discovery deadline.  Further, Dr. Braun asserts that Medtronic's decision not to depose Ms.

Newell at the scheduled date and time was strategic and not based on any inherent inability to

meet the scheduling order requirements (Document Number 126).

Federal Rule of Civil Procedure 16(b)(4) provides that the Court's scheduling "may be

modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Relevant

factors to consider in reopening discovery include:  "(1) whether trial is imminent, (2) whether

21

the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood the discovery will lead to relevant evidence." Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990).

Trial is scheduled for October 23, 2013.  While that date is approaching, the court concludes that minimal prejudice will result if Medtronic is allowed to depose Ms. Newell after the fact discovery deadline and, on balance, the request should be granted.  Moreover, Medtronic agrees to allowing Dr. Braun's counsel to participate in the deposition by telephone thereby reducing the cost of counsel having to travel to Vermont (Document 130).  Given the unique circumstances surrounding Dr. Braun's filing of a motion for a protective order, along with Ms. Newell's counsel's purported objection to a second deposition and suggestion to postpone the deposition until resolution of that motion (Document Number 117), the court finds an extension outside the discovery deadline to be appropriate.

For these reasons, and finding good cause therefore, the court hereby GRANTS Medtronic's motion to depose Ms. Newell outside the discovery deadline.  Ms. Newell's deposition shall be taken within thirty days after Medtronic's receipt of documentation relevant to the subpoena duces tecum.

## V.  Dr. Braun's Second Motion To Compel

Through its second motion to compel, Dr. Braun seeks information and documentation related to physicians other than Dr. Braun and to devices other than those designed for the fusionless treatment of scoliosis.  Dr. Braun contends that the requested information is relevant to

22

Medtronic's alleged practice of entering into license agreements with physicians in order to secure loyalty to Medtronic products (Document Number 111).  In support of its second set of discovery requests, Dr. Braun directs the court to the testimony of third party witness Dr. James Ogilvie who entered into an agreement "to consult on the development of a device at a time when he was implanting millions of dollars of [Medtronic] products into his patients each year." (Document Number 111).[25]   In response, Medtronic objects on the grounds that the disputed interrogatories and requests for production are overly broad and not properly tailored to the discovery of information related to Dr. Braun and his fusionless scoliosis device (Document Number 121).

      Similar to Dr. Braun's first motion to compel, the issue is the proper scope of discovery. While Dr. Braun seeks the discovery of information related to all physicians' development, licensing and devices, Medtronic seeks to limit discovery to only that information which is similar to Dr. Braun and his fusionless scoliosis device.  Similar to the court's ruling in the first motion to compel, as discussed in this order, the court will generally limit discovery to similarly situated individuals and devices.  *See* Donovan v. Wal-Mart Stores, Inc., 2012 WL 3025877 *2 (D.S.C.).  The court addresses each disputed interrogatory and request for production as set forth below.

---

[25] Dr. Ogilvie testified regarding the symbiotic relationship between doctors who utilize Medtronic products and their placement as "key opinion leaders" within the company (Document Number 111).

23

**\*Interrogatory Number 28.**[26]

Dr. Braun argues that Interrogatory Number 28 is properly limited to the identification of spinal implant devices for which Medtronic has performed an IDE study through the FDA. Because performing an IDA study was a key obligation under the parties' agreement, Dr. Braun contends that this information will assist in assigning a value to the IDE study on his device that Medtronic failed to perform.  Medtronic objects, arguing that the interrogatory is overbroad and not limited to information regarding fusionless devices or devices that are similar to Dr. Braun's concept.  Further, Medtronic indicates that it has not conducted any IDE studies on devices used in the fusionless treatment of scoliosis.

The court recognizes that the cost of an IDE study will vary widely and is dependent upon the particular device being studied.  However, this interrogatory is properly tailored to IDE studies for spinal implant devices.   Accordingly, the motion to compel is granted.

**\*Interrogatory Number 31.**[27]

Through this interrogatory Dr. Braun seeks information pertaining to the total number of agreements that Medtronic entered into to develop medical devices and the number of devices it commercialized.  Dr. Braun asserts that this information is relevant to his claim that Medtronic

---

[26]Interrogatory Number 28 requests that for the period 1998-2007, Medtronic identify the spinal implant devices for which Medtronic conducted an investigational device exemption (IDE) study through the FDA and identify the total cost to Medtronic of conducting each of those studies.

[27]Interrogatory Number 31 requests information for the period 1999 to 2007, and seeks identification of: a) the total number of invention licensing and/or royalty agreements that Medtronic entered into with physicians (not employed by Medtronic); and b) the total number of medical devices commercialized for sale as a result of the invention licensing and/or royalty agreements referenced in Part a.

enters into agreements with physicians without any intention to perform.  Medtronic objects

arguing that its licensing and royalty agreements with physicians that have nothing to do with the

fusionless treatment of scoliosis are not relevant.

The court agrees with Medtronic that, as drafted, this interrogatory is overbroad since it

requests information about any and all agreements with physicians regardless of the medical

device at issue.  The court grants the motion to compel only in part, limiting the inquiry to

agreements between Medtronic and other physicians for spinal implant devices.

**\*Request For Production 94.[28]**

Dr. Braun asserts that the information contained in this request is relevant to Medtronic's

alleged pattern of entering into agreements with physicians as a vehicle to gain loyalty to

Medtronic products.  Dr. Braun argues that the relevance of this inquiry is bolstered by the

testimony of Dr. Ogilvie, Mr. Kuzio and other public reports surrounding Medtronic's

institutional practices.  While Medtronic agrees to produce all responsive documents that pertain

to Dr. Braun, it contends that the request for additional documentation is overbroad and not

reasonably tailored to the discovery of relevant information.  The court grants this request in part,

limiting discovery to those documents, if any, that are related to Dr. Braun and other spinal

implant physicians.

---

[28]Request For Production 94 seeks the production of all documents concerning
Medtronic's, study, analysis or investigation of whether physicians receiving licensing, royalty, or
consulting fees from Medtronic tend to purchase and/or use more Medtronic devices in their
medical practice.

**\*Request For Production 96.[29]**

In support of his claim that Medtronic enters into licensing and royalty agreements with other physicians without an intent to perform, Dr. Braun requests information on the number of agreements for medical devices that Medtronic entered into and commercialized.  Medtronic has supplied all responsive documents related to Dr. Braun during the period of October 1999 through June 2003, but objects to the production of documents not related to Dr. Braun.  The court grants the motion to compel in part, limiting discovery to those agreements and information on commercialization involving Dr. Braun and other spinal implant physicians.

**\*Request For Production 98 through 101.[30]**

Through these requests for production, Dr. Braun seeks information on the contents and sales of Medtronic's spinal fusion instrumentation.  Dr. Braun argues these requests are relevant to his claim that Medtronic failed to develop his invention in order to avoid affecting Medtronic's own lucrative fusion market.  Further, Dr. Braun believes that the scope of the

---

[29]Request For Production Number 96 seeks information the production of documents from the period 1998 to 2007, concerning Medtronic's strategy to generate sales by paying physicians to attend meetings, providing free or discounted services to physicians, or paying physicians under consulting and royalty agreements.

[30]Request For Production Number 98 seeks documents sufficient to identify all of the components included in a Medtronic spinal fusion kit, (i.e., the Horizon CD System).  Request Number 99 seeks the production of documents from the period 1999-2011, sufficient to show gross sales and net profits for Medtronic's fusion instrumentation used in the surgical treatment of scoliosis.  Request For Production Number 100 seeks the production of documents for each year from 1999-2011, showing the total number of Medtronic spinal fusion kits sold (i.e., the Horizon CD system) in the United States.  Request For Production Number 101 seeks the production of documents for each year from 1999-2011, sufficient to show the total number of Medtronic spinal fusion kits sold (i.e., the Horizon CD system) worldwide.

information is relevant to damages since if Medtronic had developed and commercialized his device, it may have had uses beyond the treatment of scoliosis.

As to these requests for production, Dr. Braun's motion to compel is granted to the extent that Medtronic is required to produce the requested documentation for the CD Horizon Legacy Spinal System, along with any other spinal fusion kits and or instrumentation that was indicated for the treatment of scoliosis during the period of time from 1999-2011.  The request is denied as to devices that were not indicated for the treatment of scoliosis since it is purely speculative whether Dr. Braun's concept would have been used beyond the treatment of scoliosis.

**\*Requests For Production 102 through 104.[31]**

Through these requests Dr. Braun seeks information regarding Medtronic's costs and profits from the sales of it spinal fusion instrumentation.  Medtronic claims the requested information is not relevant because Dr. Braun's royalties from the sales of his invention were to be "calculated as a percentage of the invoiced amount, not profit margin" and therefore Medtronic's profits from fusion sales are irrelevant (Document Number 111).

The Court grants this request in part, requiring Medtronic to provide sales and net profit information for the CD Horizon Spinal Systems along with any other spinal fusion kit or instrumentation that was indicated for the treatment of scoliosis.

---

[31]Request For Production 102 seeks the production of documents for each year from 1999-2011, sufficient to show the retail cost of an Medtronic spinal fusion kit (i.e., the Horizon CD System) in the United States.  Request For Production Number 103 seeks the production of documents for each year from 1999-2011, sufficient to show the retail cost of an Medtronic's spinal fusion kit (ie., the Horizon CD System) worldwide (expressed in U.S. Dollars).  Request For Production Number 104 seeks the production of documents for each year from 1999-2011, sufficient to show Medtronic's actual costs to produce an MSD spinal fusion kit (i.e., the Horizon CD System).

In conclusion, the Court hereby GRANTS Dr. Braun's Motion To Compel as to Interrogatory Number 28, and GRANTS the Motion To Compel IN PART as to Interrogatory Number 31 and Requests For Production 94, 96, 98, 99, 100, 101 102, 103 and 104.

## VI.  Conclusion

Accordingly, it is hereby ORDERED:

1.  Dr. Braun's First Motion To Compel is granted in part and denied in part.

2.  Medtronic's Motion For Leave To Filed Counterclaims and Second Amended Complaint is denied.

3.  Dr. Braun's Motion For Protective Order Against Subpoena To Maira Newell is granted in part and denied in part.

4.  Medtronic's Motion To Expedite Motion For Leave To Depose Maria Newell is granted.

5.  Dr. Braun's Second Motion To Compel is granted in part and denied in part.

DATED this 2nd day of January, 2013.

_____
Dustin Pead
United States Magistrate Judge

28