1              IN THE UNITED STATES DISTRICT COURT

2                       DISTRICT OF UTAH

3                       CENTRAL DIVISION

4

5    JOHN T. BRAUN, M.D.,              )

6              Plaintiff,             )

7    vs.                              )   CASE NO. 2:10-CV-1283RS

8    MEDTRONIC SOFAMOR DANEK, INC.,   )

9              Defendant.             )

10   _____)

11

12

13          BEFORE THE HONORABLE ROBERT J. SHELBY

14   -------------------------------------

15                   February 19, 2014

16

17                     Jury Trial

18                     Volume I

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3
      For Plaintiff:            ALAN BRADSHAW
 4                              CHAD R. DERUM
                                136 East South Temple
 5                              Suite 1300
                                Salt Lake City, Utah
 6
                                ROGER DODD
 7                              3319 America Saddler Drive
                                Park City, Utah
 8

 9

10
      For Defendant:            JAMES JARDINE
11                              JOHN ADAMS
                                RYAN BELL
12                              GREG NEWMAN
                                36 South State Street
13                              Suite 1400
                                Salt Lake City, Utah
14

15

16

17

18

19

20

21
      Court Reporter:           Ed Young
22                              Rebecca Janke
                                Laura Robinson
23                              Patti Walker
                                247 U.S. Courthouse
24                              350 South Main Street
                                Salt Lake City, Utah 84101-2180
25                              801-328-3202
```

1                         I N D E X

2

3      Witness                Examination By              Page
       -------                --------------              ----

4

5

6

7

8

9

10

11

12

13

14

15
       Exhibit                                        Received
16     -------                                        --------

17

18

19

20

21

22

23

24

25

```
 1   February 19, 2014                               8:30 a.m.

 2                    P R O C E E D I N G S

 3

 4        THE COURT:  We'll call Braun vs. Medtronic,

 5   2:10-CV-1283.  We're on the record.

 6        Good morning, everyone.

 7        Just a couple of matters.  First, we received your

 8   objections to the proposed jury instructions, at least Dr.

 9   Braun's, and we have reviewed those this morning and they

10   look perfect, like exactly what we had in mind by way of

11   format.  Thank you.

12        Medtronic, we just have not looked at yours yet,

13   but I am sure they are fine.

14        Also, we entered this morning the trial order.  It

15   may not be on the docket yet, but we signed and entered

16   that.  Thank you for your work on that.

17        I think you have trial notebooks for the jurors.

18   Counsel, did you have in mind that you wanted the jurors to

19   have those during your openings or afterwards?

20        MR. JARDINE:  I think afterwards, Your Honor.  We

21   are fine with that.

22        MR. BRADSHAW:  That is fine, Your Honor.

23        THE COURT:  We'll do that.

24        I wanted to give you rulings on the last few

25   evidentiary issues that we had last night, and I appreciate
```

```
1   you bringing them to our attention, even if we were all a
2   little punch drunk after a long day yesterday.
3           Let's do this quickly and get the jury in here.
4   I'm looking at Mr. Pafford's deposition testimony.  There
5   were objections raised to the proposed testimony beginning
6   at page 63 over to 66, and also beginning on page 75 and
7   over to page 77, and then continuing again on 79 to 81.  Let
8   me take up those three segments first.
9           I'm going to sustain the objections.  In my view
10  the deposition testimony that is proposed here is irrelevant
11  to the issues in dispute.  There is a question in this case,
12  in my mind, about the date of conception and ownership of
13  Dr. Braun's invention, but it relates entirely to his
14  service at the Air Force and issues that came to light many
15  years after the fact.  What Medtronic believed was necessary
16  for conception or the date of conception under its own
17  policies and practices in 1999 and 2000 I think are wholly
18  irrelevant.
19          I also think that if Dr. Braun wanted to pursue
20  Medtronic's contentions concerning those issues, that the
21  proper format for that was to serve contention
22  interrogatories or to provide a Rule 30(b)(6) area of
23  inquiry in that regard, not to ask a fact witness after the
24  fact.
25          Moreover, I'm concerned that the testimony is
```

1    riddled with legal conclusions and I think on whole, in

2    light of the remote relevance, if any, and the risk of

3    confusion or prejudice I'm going to sustain the objections

4    to the testimony we just discussed.

5         On the other hand, the testimony that is provided

6    on pages 89 to 91, I don't see that it is particularly

7    helpful, and I am not sure what the relevance is, but I

8    don't see that it is unusually prejudicial, and while there

9    is I think a close call on foundation, it seems to me the

10   witness can testify about that matter.  We'll overrule the

11   objection with respect to that last segment.

12        MR. DERUM:  Can I just ask for one point of

13   clarification?  The Court addressed last night that there

14   was a separate issue with respect to the testimony given at

15   pages 80 to 81 where this witness, Mr. Pafford, who signed

16   the license agreement, expresses an understanding about what

17   the date of conception was for the license agreement.  I

18   just want to understand if the Court's ruling encompasses

19   that, and --

20        THE COURT:  It does.  What a fact witness years

21   after the fact thinks the date of conception of this

22   invention is just by looking at it -- he has no idea.  Dr.

23   Braun knows the date of conception.  This witness has no

24   basis for that testimony.  He can look at a document and see

25   the date that is on it, and that is what he has testified

1    about here, but I think it lacks foundation in so far as it

2    purports to be the testimony of a Medtronic employee about

3    the date of Dr. Braun's conception.

4         I am sustaining the objection.

5         MR. DERUM:  Very good, Your Honor.  Thank you.

6         THE COURT:  Is there anything more we should take

7    up before we bring the jury in?

8         Mr. Jardine.

9         MR. JARDINE:  Just one question, Your Honor.  It

10   would helpful if we could take a break between the openings

11   to just set up and make sure our audiovisual is working.  I

12   don't know what you were planning.

13        THE COURT:  Do you mean between the two opening

14   statements?

15        MR. JARDINE:  Yes, between Mr. Bradshaw's and

16   mine.  I think it will be about an hour, and --

17        THE COURT:  I had had in mind that if the

18   plaintiff's opening was on the order of an hour that we

19   would give the court reporters a short break anyway before

20   we get into the next opening.  Let's do that.  That is

21   great.

22        MR. JARDINE:  Thank you.

23        THE COURT:  Anything more, counsel?

24        Ms. McNamee, let's bring the jury in.

25        MR. BRADSHAW:  Your Honor, just a logistical

```
 1    question for you.

 2               THE COURT:  Yes.

 3               MR. BRADSHAW:  We're going to use the screen, but

 4    we also have three foam boards, and I'm wondering if after

 5    the jury has filed in if we can put the easel in front of

 6    the witness chair and put one of the boards there, and then

 7    my assistant, if she can sit in the witness chair, she can

 8    change those out.

 9               THE COURT:  That is fine.

10               I forgot to ask whether any of you were intending

11    to invoke the exclusionary rule and whether that would be

12    relevant for openings.

13               MR. JARDINE:  We do not, Your Honor.

14               THE COURT:  All right.

15               MR. BRADSHAW:  Yes, Your Honor.

16               THE COURT:  I'm sorry?

17               MR. BRADSHAW:  Yes, Your Honor, we would.

18               THE COURT:  Is there anyone here on behalf of

19    Medtronic, other than the client representatives who are at

20    counsel table, that are witnesses in the case?

21               MR. JARDINE:  I think that raises the issue of Mr.

22    Horseman, who has been the supervising in-house lawyer that

23    they have listed as a may-call.

24               THE COURT:  Right.

25               MR. BRADSHAW:  We have no objection to Mr.
```

```
 1    Horseman remaining.

 2              THE COURT:  Mr. Horseman may remain.

 3              MR. JARDINE:  Your Honor, I'm being prompted to

 4    ask, does that include experts?

 5              THE COURT:  I don't believe it does.

 6              Mr. Bradshaw?

 7              MR. DERUM:  Mr. Richter, as we know, is not just

 8    an expert.  He is wearing a variety of hats.

 9              THE COURT:  He is offering expert testimony?  He

10    is, is he not?  Doesn't he need to be present so that he has

11    an opportunity to provide that testimony in the context of

12    the other expert opinions that are provided?

13              MR. DERUM:  That would be up to the party offering

14    the testimony, but I am just raising the point that, as the

15    Court knows, he is not only an expert.  There are other

16    factual matters.

17              THE COURT:  Well, I am limiting his testimony in

18    that regard and we talked about that.  Mr. Richter may stay.

19              (WHEREUPON, the jury enters the proceedings.)

20              THE COURT:  Good morning, members of the jury.

21    You all look a little more fresh than you did when last we

22    visited.  It is good to see all of you.

23              Just a little housekeeping so that you have some

24    idea what to expect by way of schedule.  We spoke about this

25    briefly yesterday, but it was early, and many of you
```

1    probably didn't really think you would be seated in those

2    seats.  We'll be going from about 8:30 in the morning until

3    5:00 each day.  We'll take a 45-minute lunch break sometime

4    around 11:45, so about every hour and a half or so.  It is

5    helpful for our court reporters to have a break to stretch

6    their fingers, and I find that the attorneys like a chance

7    to clear their heads, and it is not so bad for you folks

8    either.  So we'll take short 15-minute breaks about every

9    hour and a half.

10            This morning we'll have opening statements, and

11   we'll probably take a short break between the opening

12   statements to change out some audiovisual and allow the

13   court reporter to stretch a little bit.  Then we'll sort of

14   get into a more routine schedule after that.  We will begin

15   this morning with opening arguments.

16            Counsel, are you prepare to proceed?

17            MR. BRADSHAW:  We are, Your Honor.

18            MR. JARDINE:  We are as well, Your Honor.

19            THE COURT:  Thank you.

20            Mr. Bradshaw, you have the floor.

21            MR. BRADSHAW:  Thank you, Your Honor.

22            Your Honor, would you let us know if this unduly

23   obstructs?

24            THE COURT:  Don't worry about me.  I'll be fine.

25            MR. BRADSHAW:  Good morning, ladies and gentlemen.

1          I introduced myself yesterday.  I am Alan Bradshaw

2   and I am counsel for Dr. John Braun with my co-counsel, Chad

3   Derum and Roger Dodd.  Dr. Braun is seated here.  Dr.

4   Braun's wife, Cricket Braun, who was here yesterday, they

5   have had a daughter who has had a potentially serious

6   medical issue come up and she has had to go home.  We're

7   planning on bringing her back next week.  That is the reason

8   that she is not here.

9          I would like to talk to you about what the

10  evidence is that you will see in this case.  The evidence

11  will show that Dr. Braun is an orthopedic spine surgeon who

12  has essentially dedicated his career to helping children and

13  adolescents with the treatment of scoliosis.

14         Now, scoliosis, as you may understand, is a

15  serious spinal deformity that impacts approximately 25,000

16  to 30,000 children and adolescents in the United States each

17  year.  Scoliosis essentially has an indication in two

18  different forms.  One is what is called early onset

19  scoliosis or EOS, which is basically children from zero to

20  age nine.  There is also something called adolescent

21  idiopathic scoliosis or AIS, and I know in these medical

22  cases the abbreviations are difficult, but I have put up on

23  this board an indication of some of the different kinds of

24  terms that you will be hearing in this case.

25         It is inevitable that the lawyers and the

1    witnesses will be using some of these terms.  This is not

2    designed to be a full definition.  It is just designed to

3    try to give you some kind of indication of what we're

4    talking about and what area we are in.

5          With respect to AIS, which is what effects the ten

6    to 18 year olds, for reasons that no one really understands

7    it impacts girls five to seven times more often than it

8    effects boys.  The treatment for scoliosis for children and

9    adolescents is a fusion surgery.  No one in this case will

10   dispute that a fusion surgery is a very serious and a very

11   invasive surgery.  It essentially involves the surgeon

12   entering from the posterior, and that is another term that

13   you're going to hear quite a bit, posterior and anterior,

14   but it is a posterior application where the surgeon gets

15   into the back of the spine and inserts two rigid rods, and

16   hooks those rods with hooks and screws to the child or

17   adolescent, and then the spine itself is fused.  So the

18   issue with the fusion surgery is that the child loses growth

19   motion and function of the spine.

20         The defendant in this case is Medtronic Sofamor

21   Danek.  The evidence will show that Medtronic is one of four

22   large manufacturers of medical devices including, and in

23   particular, it is a manufacturer of fusion products.  The

24   evidence will show that Medtronic basically sells

25   approximately 50 percent of the products that are used for

1    fusion surgeries in the United States.

2           Dr. Braun and Medtronic entered into a contract,

3    which the Court has discussed with you, called a license

4    agreement.  That license agreement was effective April 1st

5    of 2000.  The license agreement includes an assignment by

6    Dr. Braun to Medtronic of an invention that involves a

7    fushionless treatment for adolescent idiopathic scoliosis,

8    so for treating the young boys and girls age 10 to 18.

9           Now, the reason it is called fushionless is

10   because it does not involve the fusing of the spine.  I will

11   get into more of the details of what it specifically does,

12   but in a nutshell it involves using what is called a bone

13   anchor, which goes into the vertebrae, that is then tethered

14   with a flexible tether on one side of the spine and not the

15   other side of the spine.  The idea is that as the surgery is

16   performed the surgeon can get a correction on the convex

17   side of the Spain.  This is the convex side, this side, as

18   it is curved.

19          Then as the child grows and as the child goes

20   through puberty you get additional correction because the

21   side that is tethered with the flexible tether is restrained

22   in its growth.  The other side as the child grows continues

23   to grow and you get additional straightening of the spine.

24   You have essentially straightening during the surgery as

25   well as as the child grows.

1          With respect to the fusionless treatment of

2     scoliosis, the child continues to have the function and the

3     growth and motion associated with their spine, rather than

4     having to fuse those disks.

5          Now, you're going to hear some evidence about

6     other fusionless products that Medtronic had in connection

7     with its potential pursuit of a fusionless treatment for

8     scoliosis.  I would like to mention one of those.  Again, in

9     shorthand, there is something called a screw/tether, which

10    essentially involves a Medtronic screw, rather than a bone

11    anchor that Dr. Braun designed, but it also includes a

12    flexible tether on the convex side of the spine.

13         They also had something called SMA staples, which

14    were what they sound like, and they were staples that were

15    used to staple the convex side of the spine as part of the

16    operation, leaving the other side of the spine so that it

17    could continue to grow.

18         Now, the license agreement that Dr. Braun entered

19    into contains significant shall promises by Medtronic to Dr.

20    Braun.  We're going to look at those in considerable detail,

21    but central to the evidence that you will hear is that

22    Medtronic firmly promised that it shall in the contract do

23    five things.  One, that it would conduct research and

24    development necessary to commercialize Dr. Braun's

25    invention.  Two, that it would prepare and execute a

1    development plan.  Three, that it would file an application

2    with the FDA, the Food and Drug Administration, and conduct

3    human clinical trials if required by the FDA.  The evidence

4    will show that such human clinical trials were not only

5    required by the FDA, but that Medtronic always, always knew

6    that they would be required.  The evidence will show that

7    this single promise by Medtronic to conduct human clinical

8    trials represents approximately a $30 million commitment to

9    Dr. Braun and to the development of his device.

10          Medtronic also promised Dr. Braun that it shall

11   provide worldwide marketing and distribution.  Medtronic

12   also agreed to use sound and reasonable judgment in

13   obtaining patent protection for Dr. Braun's device.  The

14   evidence will prove quite clearly that Medtronic did not

15   perform any of these contract promises as well as other

16   contract promises.

17          The evidence will show, for example, that

18   Medtronic put into the agreement as Exhibit B a projected

19   development plan, which was a prediction of when Medtronic

20   thought things would occur under this development plan.

21   That development plan that was dated April 1st of 2000 was

22   never changed, even though the agreement required that a

23   subsequent plan be entered into and executed.

24          Human trials under that development plan in the

25   agreement were projected to begin in April of 2002.  In

1   reality, Medtronic has never sought from the FDA permission

2   to do a human clinical trial, either with respect to Dr.

3   Braun's anchor tether or with respect to Medtronic's

4   screw/tether.  They have never gone to the FDA from that

5   time, from 2000 until now.

6           The evidence will show that Medtronic committed to

7   prepare and execute a subsequent development plan.

8   Medtronic never did so in the ten years between when the

9   contract was signed in 2000 and when Dr. Braun brought this

10  lawsuit in 2010.  The evidence will show that the main thing

11  that Medtronic did do was pay for animal studies by Dr.

12  Braun.  What they were doing was they were paying for Dr.

13  Braun to conduct research on live goats.  They were paying

14  for the hardware associated with those studies, and they

15  were paying for some of Dr. Braun's research assistants to

16  work on those projects between 2000 and 2006.  They were not

17  separately compensating Dr. Braun for his time and effort in

18  pursuing the animal studies.

19          The evidence will show that Medtronic's commitment

20  was approximately a $275,000 commitment over a six-year

21  period to do the animal studies.  The evidence will show in

22  context, that that $275,000 comes in the context of where

23  Medtronic is projecting the cost of development of the

24  device of Dr. Braun and the method that Dr. Braun had was

25  $62 million to bring it to market.

1          You're going to hear substantial reasons why
2     Medtronic refused to perform.  The reason that you're going
3     to hear evidence as to the why question, is because the
4     reasons why Medtronic didn't perform the contract is
5     relevant to other claims that Dr. Braun has brought in this
6     case.  Those claims include a claim for fraudulent
7     inducement, inducing him to enter into the license
8     agreement, and they also relate to claims related to the
9     misappropriation of Dr. Braun's ideas and intellectual
10    property into patents that Medtronic filed on its own behalf
11    not naming Dr. Braun as an inventor.

12          The evidence that you will hear is that Medtronic
13    didn't intend to perform its contract, because doing so is
14    inconsistent with the way it does business and its business
15    model.  We're going to look at a number of documents that
16    relate to the way they do business.  The evidence will
17    include that Medtronic simply does not make shall promises.
18    It does not make promises consistent with those five
19    commitments that it made to Dr. Braun in this case.

20          Medtronic normally commits to development,
21    including things like FDA filings and the tens of millions
22    of dollars in costs, only within its discretion and only if
23    it chooses to proceed, but that is not the case with respect
24    to Dr. Braun.  The evidence will also show that Medtronic
25    uses its contracts like it entered into with Dr. Braun to

1    try to keep surgeons within the Medtronic family.  A surgeon

2    like Dr. Braun, by himself, one individual surgeon, an

3    orthopedic surgeon who is doing spinal surgeries, in a year

4    can provide, the evidence will show, $1 million of profit to

5    Medtronic by himself with respect to the particular products

6    that he chooses to install within the patients who he

7    treats.

8           You're also going to hear substantial evidence

9    that Medtronic's firm commitment to Dr. Braun was

10   inconsistent with its business plan and its way of doing

11   business.  The evidence of the business plan will reveal

12   that while Medtronic always knew that a human clinical trial

13   would be required by the FDA, Medtronic never intended to

14   perform that promise and the extraordinary expense involved.

15   The evidence will consist of documents, and the fact that

16   even as of today Medtronic has never committed, funded or

17   budgeted for the necessary FDA clinical trials with

18   fusionless tethered devices.

19          Another example of the inconsistency between

20   Medtronic's business model and the contract will be

21   documentary evidence, that after promising Dr. Braun that it

22   would pursue patent protection on his behalf, Medtronic

23   filed and obtained a very limited patent on behalf of Dr.

24   Braun covering the bone anchor, but not the surgical methods

25   disclosed by Dr. Braun to Medtronic.  What Medtronic did is

1    it consciously abandoned Dr. Braun's surgical methods, and

2    the evidence will show that literally three weeks after

3    abandoning those surgical methods on behalf of Dr. Braun,

4    Medtronic filed a patent through its own employees listing

5    that surgical method and not listing Dr. Braun as an

6    inventor of that method.

7         The evidence of the planning documents will reveal

8    Medtronic's business motivations.  Specifically, the

9    business plan was to develop a fusionless tether device if,

10   and only if, Medtronic could do so without having to spend

11   tens of millions of dollars on human clinical trials.  The

12   evidence will show that Medtronic was willing to pursue the

13   fusionless tether devices only if it didn't put in jeopardy

14   Medtronic's 50-percent share of the existing fusion

15   surgeries that it was doing on children and adolescents, and

16   only if it had a competitor who was ready to come into this

17   area and take away its market share.

18        The evidence will show that Medtronic was not

19   otherwise going to disrupt its approximately $200 million

20   share of profits associated with fusion surgeries on

21   children and adolescents.  The evidence will reveal that in

22   pursuing its business strategy Medtronic continued to buy up

23   as many patents within the fusionless area as it could

24   obtain.

25        I'm now going to discuss some of that specific

1   evidence, and I'm going to try to talk about it really in

2   three pieces.  I'm going to talk about the evidence of

3   Medtronic's lack of effort to get regulatory approval from

4   the FDA, and I'm going to talk about the evidence of their

5   conduct in patenting for itself Dr. Braun's ideas, and I am

6   going to talk about the overall lack of development of a

7   commitment to what it promised in the license agreement.

8           Now, I'm going to ask you to pay particular

9   attention to the exhibits that I identify and the exhibit

10  numbers.  The reason is is because there are parts of this

11  story that you are only going to see and understand through

12  Medtronic's business records.  When you're presented with

13  the opportunity to make a decision in this case, you're

14  going to go back in the jury room and you're going to have a

15  number of documents that you're going to have to look at,

16  and you're going to have to make some decisions about what

17  those documents mean and what they represent.

18          I want to try to talk about some of what that will

19  be.  After you have heard the evidence we'll come back and

20  we'll have a chance to offer a closing argument and we'll,

21  of course, go over some of that information again.

22          It is not unusual that a company's intentions and

23  its plans would be found in its business records.  That is

24  where Medtronic's plans and way of doing business is

25  disclosed.  The evidence will show that Medtronic never

1    intended to fulfill its shall promises made to Dr. Braun.  I

2    would like to talk about some of the documents.  The first

3    one I want to talk about is Exhibit 96.  This is a business

4    plan that Medtronic prepared.  In that plan Medtronic

5    provides a short introduction about itself, and it says that

6    the primary mission of Medtronic Sofamor Danek has been to

7    provide spinal surgeons with comprehensive solutions to

8    perform fusion of the vertebral bodies.  Medtronic Sofamor

9    Danek has been a dominant force in the introduction of many

10   of these technologies and continues to be the number one

11   player in the industry.

12          The evidence will show that by 1999 and 2000

13   Medtronic recognized that there may be a better way to treat

14   children and adolescents with scoliosis.  In this document

15   Medtronic says that minimally invasive technologies have the

16   potential to reduce trauma with therapeutic interactions,

17   streamline recovery time and decrease overall treatment

18   costs.  At the forefront of all of this development is the

19   adolescent non-fusion solutions for degenerative spinal

20   pathologies.

21          This same business plan, Exhibit 96, reveals

22   Medtronic's business strategy of buying up as much of the

23   fusionless technology as it can.  Medtronic says in general

24   we have a two-pronged approach to protecting our fusionless

25   scoliosis project.  We have filed and received a number of

1    patents on the general concept of tethering the convex side

2    of the curve without fusing the spine.  This is a

3    comprehensive portfolio in the area of fusionless scoliosis

4    correction and should provide broad protection.  We have

5    also filed and continue to file device specific

6    applications.

7            You will hear testimony from Medtronic's current

8    vice president of research and development, a gentleman by

9    the name of Tommy Carls, that in general Medtronic's patent

10   and intellectual property strategy is to buy technology, and

11   sometimes the word he uses is offensively to actually

12   develop something, but sometimes it is bought to bring value

13   to the company by protection against competitors.

14           The evidence will show that Medtronic at the time

15   of its contract with Dr. Braun and thereafter always

16   recognized the impact that a fusionless surgery would have

17   on its sale of fusion products.  I would like to have you

18   take a look at Exhibit 295, which is a July 7, 2006

19   fusionless scoliosis market assessment.  This is hard to

20   read, but what it basically says is that 75 percent of the

21   procedures that will be performed for fusionless are not

22   going to come from a new market or new patients.  They will

23   be the replacements of existing fusion procedures.  So up

24   here in this document they have the 75 percent and they call

25   it net of cannibalization, and cannibalization is another

1   form we have put up here, and it is a Medtronic word, and

2   basically what it means is that those are sales of

3   fusionless products that would come from fusions.  So

4   75 percent would come from the fusion sales.

5           In other words, according to this document, which

6   shows a net profit figure of $61 million, net of

7   cannibalization for Medtronic's projection at that time,

8   that means that 133 million is coming from cannibalized

9   sales.  That is the market that Medtronic, the evidence will

10  show, has an incentive to protect.

11          If we look at Exhibit 113, which is another

12  important document, again, this is a fusionless project

13  update and this is much earlier.  This is March 27th of

14  2001.  In that document Medtronic again is looking at how

15  much fusionless is going to come from fusion.  They have 129

16  million, 147 million and 161 million in 2000 to 2002.

17          Now, the evidence will also put in context the

18  cost of developing a fusionless device.  At the time

19  Medtronic made its shall promises to Dr. Braun it

20  understood, the evidence will show, that it is a very

21  expensive proposition involving, inevitably, human clinical

22  trials.  Exhibit 332 is a 2009 document that relates to

23  Medtronic's projections at that time with respect to

24  fusionless.  In that document Medtronic is indicating that

25  the development costs associated with fusionless are $62

1    million.  That is the top, up here at the very top.

2          The other thing that they indicate is that the

3    required needs include IDE funding.  Again, that is another

4    one of those funny acronyms that you're going to hear more

5    than you care to hear about.  What that is is that is a FDA

6    reference to something called an investigational device

7    exemption.  That is the filing that you make with the FDA to

8    get permission to do a human clinical trial.

9          I would now like to talk about the license

10   agreement, which is obviously a document that is at the

11   center of this case, and I would like to talk about the

12   shall promises that were made to Dr. Braun on April 1st of

13   2000.  This is the license agreement.  Now, it has a number

14   of components.  Attached to the license agreement as an

15   exhibit, and you'll have a copy of this document, is Dr.

16   Braun's invention and his invention disclosure.  I would

17   like to talk a little bit about the invention and its

18   components.

19         Again, Dr. Braun was proposing a minimally

20   invasive approach anteriorly, and it really is not so much

21   straight on, it is more from the side through the ribs, and

22   it is done with an endoscope as opposed to having to open up

23   the back.  It includes a bone anchor, which is this device

24   at the top left, which is the item that is put into the

25   vertebrae as part of the surgery.

1          Now, that bone anchor has something, and this is

2     another funny word, something called frustoconical, which

3     basically what that means is just that it is shaped like an

4     ice cream cone where someone bit off the bottom of the ice

5     cream cone.  It is hollow.  It also has something called

6     fenestrations, which are essentially like a cheese grater,

7     so that as the bone anchor is put into the vertebral body,

8     the idea is that you have bone matter inside of that hollow

9     chamber that then grows inside of the chamber and comes out

10    of the chamber through the fenestration so that you get real

11    fixation with the vertebral body.

12          Dr. Braun then discloses on pages 7 through 10 of

13    his disclosure a corrective maneuver.  This is a surgical

14    method for correcting scoliosis without fusion.  What he

15    describes is that these bone anchors that are fixed in the

16    vertebrae are then compressed together so that you're

17    getting a correction of the scoliosis on the table, and

18    while those bone anchors are compressed you attach the

19    flexible tether so that you obtain the correction right

20    there on the table.

21          Now, the correction maneuver also describes that

22    as the surgeon has obtained correction of the scoliosis, if

23    he needs to dial in that correction he can use crimps around

24    the flexible tethers to get additional compression of the

25    vertebral bodies to get the correction exactly where the

1    surgeon wants it to be.

2           Now, the invention also involves, as I have

3    described before, this notion of -- well, let me say one

4    thing, which is that Dr. Braun will describe that this

5    surgical method, his shorthand for that is something called

6    active correction.  Now, active correction is just that.  It

7    is a shorthand.  It is a way to try to describe the surgical

8    method in a few words.

9           The invention also discloses what we will call in

10   shorthand passive correction, which is, again, this idea

11   that if you flexibly constrain one side of the spine, that

12   side of the spine will not grow, and the other side of the

13   spoon will continue to grow, and as the child grows you get

14   additional correction of the spinal curvature.

15          Now, in looking at the license agreement, this is

16   where the shall promises are contained.  What it indicates

17   is that Medtronic shall be responsible at its own expense

18   for the following tasks set forth in the development plan.

19   A, prepare and execute a development work plan in accordance

20   with the proposed development plan set forth in Exhibit B.

21   We're going to look at that development plan in Exhibit B.

22   The second part, B, prepare, file and conduct an

23   investigational device exemption, IDE, with the Food and

24   Drug Administration, if it is required.  Now, again, that

25   IDE is essentially human clinical trials.

1          C, obtain a premarket approval, something called a

2    PMA, a clearance from the FDA if it is required.  Now, what

3    that involves, and, again, new terms, but a PMA is

4    essentially the most difficult and broadest approval from

5    the FDA to market a medical device.  It comes with the fact

6    that you're going to have to do human clinical trials to get

7    that approval.  The PMA is in contrast to something called a

8    510(k), which we have put on this chart to introduce you to

9    these terms.  The 510(k) is a process where a device company

10   can go to the FDA and say we want an approval because there

11   already exists something out there that is doing what we're

12   doing.  We can essentially shortcut the process of having to

13   go with premarket approval, the PMA.  The evidence will show

14   that while Medtronic filed a 510(k) on its screw/tether, it

15   always understood that it was going to have to do human

16   clinical trials.

17          The other piece of the vocabulary related to the

18   FDA is something called an HDE.  That is a humanitarian

19   device exemption.  It basically relates to an attempt to try

20   to pursue a very small part of the market and obtain an

21   approval from the FDA to put the product in that segment of

22   the market.  Again, there is no guarantee with a 510(k) or

23   with the HDE that you don't have to do a human clinical

24   trial and IDE.  What the contract says in B and C is that

25   Medtronic would prepare and file and obtain approval for IDE

1    and PMA if it were required by the FDA.

2            The next promise that they make is that they would

3    provide worldwide marketing, sales and distribution of the

4    licensed product after receipt of U.S. and foreign

5    regulatory approvals to market and sell the licensed

6    products.  E, they would financially support the efforts by

7    Dr. Braun relating to development and evaluation, both

8    technical and clinical evaluations of the licensed products,

9    and then they reference that the estimated costs and

10   expenses of such ongoing support are set forth in Exhibit C.

11           F, financially support travel by Dr. Braun to

12   national and international surgeon meetings in order for him

13   to present research relating to the licensed products as

14   reasonably requested.

15           Now, I would also like to talk about the part of

16   this language that says if it is required by FDA.  The

17   evidence will prove without question that Medtronic always

18   knew and understood that the FDA was expected to require IDE

19   and human clinical trials.  The contract itself recognizes

20   that.  The evidence that they always understood that begins

21   with Exhibit B to the contract, which indicates that by 2001

22   in the fourth quarter Medtronic is projecting that it will

23   determine the regulatory strategy and file with the FDA, and

24   they say expect IDE PMA.  Then the contract indicates in

25   their projections that by 2002 they would begin human trials

1    if approved by the FDA.

2           You're also going to hear from Medtronic witnesses

3    who will acknowledge that they always knew human clinical

4    trials would be required.  You're going to hear by video

5    deposition from Jon Serbousek, who was a former division

6    president of Medtronic, and you're going to hear from Troy

7    Drewry, who was an engineer that worked on the project from

8    Medtronic, and you're going to hear from Medtronic's

9    regulatory experts, Tim Ulatowski and Karen Becker, all of

10   whom are going to acknowledge that they always knew that

11   clinical trials would be required.

12          That reality is confirmed in documents.  I would

13   like to refer you to several, Exhibit 116, Exhibit 117,

14   Exhibit 113 and Exhibit 114.  Looking at one of these as an

15   example, Exhibit 116, this is a plan that was prepared

16   December 5th of 2000, not very long after the license

17   agreement was entered into, and it indicates anchor and

18   tether loop need IDE.

19          Dr. Braun brought this lawsuit in 2010, and the

20   question is what did Medtronic do over the ten year period

21   from 2000 to 2010 to pursue the required FDA approvals for

22   IDE and PMA.  The evidence will be not a thing.  They never

23   filed a single application with the FDA on behalf of Dr.

24   Braun.

25          What Medtronic will say is that what they did do

```
 1   is in 2002 they filed a 510(k) permission related to the
 2   screw/tether, not Dr. Braun's device, but something that
 3   they will argue is similar enough.  They will argue that
 4   they sought 510(k) as essentially a steppingstone, that if
 5   we can get 510(k) for the screw-tether, then it would serve
 6   as a steppingstone and we could got the approval for Dr.
 7   Braun.
 8           I would like to refer to a regulatory time line,
 9   and this will be undisputed, and it is essentially important
10   evidence that you will be presented with and that you will
11   need to consider.  I will refer you to these five documents
12   that tell the regulatory time line story.  The evidence will
13   be that on October 4, 2002, three months after Medtronic had
14   filed the 510(k) on the screw/tether, and that is
15   essentially the hopeful shortcut to a marketing approval
16   from the FDA, that the FDA told Medtronic what it already
17   knew, which is set forth in Exhibit 554.  Quote, clinical
18   data is necessary.  That is what they already knew.  That is
19   what they expected and that is what they were told.  And
20   that no tether device to treat scoliosis in children would
21   be allowed without human clinical trials.
22           Then what happened?  Medtronic responded to the
23   FDA on February 24, 2003.  This is Exhibit 556.  Here is
24   Medtronic's response.  Quote, should the agency disagree
25   with our position and maintain that a clinical study is
```

```
1    required, we, as a company, would have trouble justifying

2    the cost of a clinical study.  The letter is signed by

3    Richard Treharne, who is a Ph.D. and vice president of

4    regulatory affairs for Medtronic.

5            Here is that letter.  The evidence will be that

6    that statement to the FDA is in direct conflict with section

7    3.2 of the license agreement that says Medtronic shall do a

8    PMA and IDE if FDA requires it.  It is also inconsistent

9    with Medtronic's representation in Exhibit B of the

10   agreement that it expects IDE and PMA.

11           The evidence will be that after taking the

12   position that the cost of the IDE could not be justified,

13   that Medtronic considered going back to the FDA, and they

14   prepared an agenda to do that and Medtronic has indicated

15   that they may discuss that agenda with you in their opening

16   argument.  What they have proposed in that agenda was to

17   have Dr. Braun talk to the FDA.  What the evidence will show

18   is that Medtronic simply never went back to the FDA.  They

19   never came back to Dr. Braun and even discussed with him

20   what they were going to do.

21           Instead, Medtronic made the decision to not go

22   back to the FDA.  Thereafter, and the evidence will be

23   undisputed, that Medtronic was not in communication with the

24   Food and Drug Administration for seven years.  Not that they

25   just didn't file an application, they were not in
```

1    communication with the FDA concerning any type of tethered

2    device.

3         Medtronic's regulatory experts have tried to

4    qualify that testimony by saying that, well, we did go back

5    to the FDA in 2009, so only one year prior, and with respect

6    to what is called the Shilla device.  Shilla is a completely

7    different product, and you'll hear some testimony about it,

8    and it is essentially a combination of a fusion and

9    fusionless device, both, that, again, is no less intrusive

10   than a fusion surgery.  It involves opening up the back and

11   a partial fusion of the spine.  Other than that caveat, that

12   Medtronic went back in 2009, the evidence will be that for

13   six or seven years no communications with the FDA regarding

14   the tether device.

15        The evidence of Medtronic's true intent at the

16   time it signed its agreement and committed to Dr. Braun to

17   do human clinical trials is revealed in documents, including

18   the February letter that I just showed you.  It is also

19   revealed in other documents.  I would refer you to Exhibit

20   116.  This is, again, only nine months after the contract is

21   signed.  This is dated December 5th of 2000.  This is their

22   strategic planing meeting.  This document indicates and

23   acknowledges that they need an IDE, but what do they say

24   about their intent?  That is on page 7 of that presentation.

25   They don't say we're going forward.  They ask themselves the

1    question, not that we shall do it, but does the market

2    opportunity justify the cost?

3            The evidence will show that Medtronic had other

4    only if caveats and qualifications to its firm commitments

5    to Dr. Braun.  Paragraph 3.1 of the license agreement says

6    plainly that Medtronic shall conduct research and

7    development necessary to commercialize a licensed product.

8            Now, the evidence will show that that commitment

9    is contrary to their documented business plans.  The

10   evidence of their true intention is contained in, again,

11   documents.  I would refer you, again, to Exhibits 116 and

12   117.  Look at Exhibit 117.  This is nine months after the

13   license agreement.  Rather than complete research and

14   development firmly to proceed with development of Dr.

15   Braun's device, Medtronic says that instead it is going to

16   choose.  It is going to either take the bone anchor and

17   tether, or it is going to take the screw/tether and it is

18   going to decide which is the best tether option before it

19   goes to human clinical trials and conducts an IDE.  That

20   statement of intent by Medtronic, the evidence will show, is

21   inconsistent with the license agreement and Medtronic's firm

22   commitment to Dr. Braun that they would conduct clinical

23   trials if required, not if it decides it likes the

24   screw/tether better than the bone anchor.

25           The evidence will also show that Medtronic was

1    going to pay for an IDE only if it decided that it was going

2    to pursue the bone anchor and not the screw/tether.  Looking

3    at Exhibit 113, which is the March 27, 2001 development

4    plan, Medtronic, again, the evidence will show, reveals its

5    true intent.  It is going to pick the best tether option,

6    and it then indicates how it is going to go about making

7    that evaluation.

8              Do you have the next slide?

9              This same document, the action plan, shows that

10   Dr. Braun is to receive a five percent royalty in

11   association with that product, while the screw/tether, which

12   is a screw that Medtronic has already developed, has a zero

13   percent royalty.

14             Now, the evidence will be, and you will hear

15   evidence from Medtronic's own employees, that a five percent

16   royalty is a significant royalty.  You'll hear testimony

17   from Mr. Serbousek, a former division president of

18   Medtronic, and he has negotiated license agreements, and he

19   did not negotiate this contract with Dr. Braun, but what he

20   will say is that a five percent royalty represents an

21   innovation, a first to market opportunity.  The evidence

22   will also show that up through 2005 Medtronic considered Dr.

23   Braun to be its scientific head, and those are their words,

24   of fusionless deformity.

25             I need to now talk about the patents and what

1   happened and the evidence you'll hear with respect to the

2   patents.  The documentary evidence will show what Medtronic

3   did not do to pursue its obligations under the license

4   agreement relating to patents.

5          Let's go back one.

6          Its commitments under the license agreement were

7   that it would file patent applications on Dr. Braun's

8   behalf.  It further agreed to use sound and reasonable

9   judgment in making patent prosecution decisions.  Now, here

10  are the documents, and neither side can indicate that this

11  is not a complicated issue and a complicated story, but

12  these are the key documents.  These show you essentially

13  what happened.

14         On November 5th of 2001 Medtronic filed a

15  provisional patent application on behalf of Dr. Braun.  That

16  is Defendant's Exhibit 1501.  That application lists as the

17  inventors Dr. Braun and Medtronic employees Mr. Drewry, Mr.

18  Molz and Mr. Sherman.  Now, that document, 1503, the first

19  patent application, consistent with an invention disclosure

20  document signed by Dr. Braun and Medtronic, shows and

21  depicts that the tether can be either a straight tether or a

22  loop tether.

23         Then on May 2nd of 2002, and this is Exhibit 363,

24  Medtronic filed the non-provisional patent application on

25  behalf of Dr. Braun and its employees.  Those applications

1  will become something called the 121 patent.  We're going to

2  use these shorthands, and that is just the number that is

3  associated with the patent that Medtronic obtained for Dr.

4  Braun.  That is Exhibit 435.

5       On August 14th of 2002, and this is Exhibit 649,

6  Medtronic filed a patent application that the parties will

7  call the 497 patent, with the inventors listed as Medtronic

8  employees, Sherman and Molz, not Dr. Braun.  That patent

9  describes surgical methods that Dr. Braun will testify he

10  disclosed to Medtronic in his written disclosure and in an

11  oral communication that he had with Mr. Sherman.  His

12  communication with Mr. Sherman concerned the fact that Dr.

13  Braun's idea, after coming up with the initial surgical

14  method, he said why don't we do this and let's do this in a

15  two-stage surgery.  Let's allow these anchors to become

16  fixed in the bone and grow, and that way we can obtain even

17  greater surgical correction on the table.  Once they are

18  fixated, then you can apply greater compressive forces and

19  bring them together before you put the tether around them.

20       This invention that Medtronic obtained relates to

21  precisely that idea.  It also includes aspects of the

22  disclosure made by Dr. Braun to Medtronic.  It includes a

23  flexible tether on the convex side of the spine.  It

24  includes, and it is not limited to this, but it includes a

25  fruscoconical shaped hollow bone anchor with fenestrations

1    to obtain fixation.

2         It also describes applying compressive forces to

3    bring the anchors together.  It discloses the use of these

4    methods and devices to correct scoliosis.  The evidence will

5    show that by obtaining and filing the 479 patent, which is,

6    again, Exhibit 649, Medtronic misappropriated and took for

7    itself Dr. Braun's ideas.  The evidence will also show that

8    on January 13, 2004, that Dr. Braun and Medtronic were told

9    by the patent office that they had to elect either the

10   device parts of their patent or the methods.  You'll hear

11   evidence that this is not unusual.  The patent office will

12   indicate both to Medtronic and to Dr. Braun, both in the

13   context of Dr. Braun's patent and other patents that

14   Medtronic has, to elect one or the other.  You can still go

15   back to the patent office and obtain the other, but you do

16   it in phases.

17        On January 13th they are put to that election.

18   The election is made and Medtronic says to Dr. Braun let's

19   pursue the device.  We'll do the method later.  They explain

20   to Dr. Braun that the advantage of doing it that way, that

21   there is a silver lining and a real advantage, which is that

22   if you do it in two phases that you essentially extend the

23   life of the patent, because you now have two different

24   patented things.

25        They go ahead and they say that they will pursue

1    the device now and the method later, and they tell Dr. Braun

2    why they want to do that, and they then abandon the method.

3    They never file anything to pursue Dr. Braun's method, which

4    is the most valuable aspect of what he disclosed to

5    Medtronic.  The evidence will show that election.

6           The evidence will also show that exactly three

7    weeks later on March 4th of 2004, and this is Exhibit 494,

8    Medtronic filed a patent application on behalf of its

9    employees, Mr. Drewry and Mr. Molz, and that application

10   will become a family of patents that begins with Exhibit

11   368, which is the 379 patent.  That application is

12   March 4th, 2004, Exhibit 494.  The patent they obtained is

13   Exhibit 368, the 379 patent.

14          The evidence will show that after electing not to

15   pursue the methods, that Medtronic sought and obtained a

16   patent on Dr. Braun's idea of bringing compressive force to

17   those anchors, bringing them together and attaching the

18   flexible tether while they are in their compressed state to

19   allow correction of scoliosis.

20          The last issue that I want to address in terms of

21   the story and the evidence that you will hear are the issues

22   related to what Medtronic did or didn't do to fulfill this

23   contract.  I have already covered most of it.  The answer to

24   be supplied by the evidence is they did very little.  The

25   evidence will show that they did literally nothing from a

1    regulatory point of view.  The evidence will be that they

2    were not in communication with the FDA after they tried to

3    get a 510(k) that they knew was going to result in the FDA

4    telling them what they already knew, which was human

5    clinical trials would be required.

6              On the patent front the evidence will show that

7    they patented only a small piece of Dr. Braun's

8    intervention, and, instead, took for itself other aspects of

9    his invention and put it into its own patents filed in the

10   names of its employees.

11             With respect to the overall development, the

12   evidence will show that Medtronic, and you'll hear from its

13   witnesses a number of I don't remember and I don't recall,

14   but what the evidence will show is that they paid $275,000

15   over a six-year period while Dr. Braun engaged in animal

16   research related to his invention.  He conducted that

17   research at the University of Utah and elsewhere.

18             The evidence will show that despite repeated

19   requests by Dr. Braun to proceed, that Medtronic continued,

20   and in its own internal words the project was in phase zero.

21   The evidence of Medtronic's nonperformance includes Exhibit

22   122, which is a Braun disclosure status document prepared in

23   2006.  The document reveals a series of admissions by

24   Medtronic concerning its lack of contract performance.  At

25   page 3 of that PowerPoint presentation Medtronic presents

1    what it has done.  Prepare the development work plan.  What

2    it is referring to is that it had one attached as Exhibit B

3    to the initial contract on April 1st of 2000, and we know

4    that it did that.

5           To financially support ongoing research efforts.

6    We know it paid $275,000.  Financially support travel.  That

7    is what Medtronic indicates it has done.

8           Now, let's look at the next slide which indicates

9    what it has never done.  Incomplete.  Never executed a

10   development work plan in accordance with the proposed

11   development plan set forth in Exhibit B.  It has never

12   prepared and filed and conducted an investigational device

13   exemption for the Food and Drug Administration if it is

14   required, which it was.  It has never obtained premarket

15   approval clearance with the FDA if it is required, which it

16   was.  It never provided worldwide marketing, sales and

17   distribution of licensed product after receiving appropriate

18   U.S. and foreign regulatory approvals to market and sell

19   licensed products.

20          Let's look at the next slide which shows the

21   activities that they did perform.  Completed.  What this is

22   is this is their projection, Exhibit B, and it is showing

23   from what we predicted and the dates that we would complete

24   these things and what did we actually do.  Well, they have

25   gone through activities that were projected to be complete

1    by 2001 in the first quarter.

2            Now, let's look at the next slide.

3            This is what they didn't do.  These are the things

4    that were to be done in the original projections by the

5    second quarter of 2000, the third quarter of 2000, and the

6    fourth quarter of 2000.  They didn't select the best tether

7    option.  They didn't make a go, no-go decision.

8            Let's look at the next slide.

9            What this shows is that essentially they didn't do

10   anything beyond those few things that they projected would

11   be done in the earliest years under their projection.

12   Remember that they had indicated in their projection that by

13   2002 in the first quarter they would be conducting human

14   clinical trials.  The evidence will show that Dr. Braun was

15   also continuously misled about what Medtronic had done and

16   what Medtronic intended to do going forward.

17           The evidence will show that Dr. Braun's

18   relationship with Medtronic fundamentally changed in 2005

19   and in 2006, although, Dr. Braun, was, the evidence will

20   show, kept in the dark about important aspects of that

21   relationship.  For example, in 2005 Dr. Braun made a

22   decision as a surgeon, a medical decision to stop using

23   Medtronic products.  The evidence will show that Medtronic's

24   response to that was to take Dr. Braun -- he is no longer

25   the head of their team of fusionless, and he is not even on

1    their list of what they call KOLs, another abbreviation, key

2    opinion leaders.  These are the surgeons who are involved in

3    this area and he is not on the team anymore.

4         The evidence will show that Medtronic had been

5    assembling its new team, unbeknownst to Dr. Braun.  The

6    evidence will also show that by 2006 Medtronic was no longer

7    investing in a company called Axial.  Up to that point Axial

8    had been funded by Medtronic, and it had one of its

9    representatives who sat on the board of directors of Axial.

10   We're going to hear from Dr. Braun and from James Ogilvie,

11   two physicians, who at the time were at the University of

12   Utah and involved with Axial.

13        Axial was a company that was doing genetic

14   research to try to determine which of these children and

15   adolescents would end up with the curvature of the spine and

16   having to have a fusion surgery because they would continue

17   to progress, and trying to predict in which of those that

18   would happen.  The evidence will show that once Axial became

19   funded by a Medtronic competitor, that Medtronic's firm

20   shall commitments to Dr. Braun became even less important to

21   Medtronic.  The evidence will show that Medtronic, as a

22   matter of business practice, simply was not willing to

23   fulfill its contract obligations to Dr. Braun so long as he

24   was involved with a company that Medtronic now perceived as

25   a competitor.

1           The evidence of Medtronic's misrepresentations to

2    Dr. Braun will be presented in documents.  I would refer you

3    to Exhibit 497.  This is a document dated February 8th of

4    2006.  It is a PowerPoint presentation.  Medtronic is,

5    again, trying to indicate to Dr. Braun that we are working

6    on your project and we are proceeding we are continuing and

7    we have not given up on this idea and we're going forward.

8    If you look at what they show to Dr. Braun under bone anchor

9    project plan, they specifically say in this 2006 document,

10   regulatory submission, prepare and submit 510(k), receive

11   decision from FDA.  That is what Dr. Braun was told.

12           The evidence will show that if you compare Exhibit

13   497 with 123, which is a document dated the same day, and it

14   has the same title and the same update, and let's look at

15   what they indicate internally.  On the FDA plan, the bone

16   anchor project plan, regulatory submission, prepare and

17   submit 510(k) for Eclipse screw, receive decisions from FDA,

18   currently not resourced.

19           The evidence will show that by December 9th of

20   2006, which is an important date, and you're going to hear

21   from Medtronic about what happened on December 11th of 2006,

22   so this is two days before, that Medtronic has a fusionless

23   think tank.  In that think tank you can see that it has a

24   new team of surgeons.  It is Dr. Skaggs, Dr. Lenke, Dr.

25   McCarthey and Dr. Oswald.  This is two days before Dr. Braun

1     sends an e-mail to Medtronic.

2            The e-mail, which Medtronic will discuss with you,

3     is an e-mail from Dr. Braun to Medtronic and he is

4     reasonably indicating his concerns.  He is not happy.  He

5     wants some answers.  You need to look at that document and

6     look at what it actually says.  The first line of Dr.

7     Braun's response, and, again, at this time he will testify

8     that he has no idea that they have already assembled their

9     own fusionless team, and he is operating under the

10    assumptions based on that PowerPoint I showed you before

11    that Medtronic is still going forward and that they are

12    going to help him.  His first thing is to say thank you for

13    your recent efforts to rejuvenate my fusionless project at

14    MSD.  I am hopeful that with a renewed commitment by MSD

15    we'll be able to make some progress in the development of

16    these devices.  He concludes the e-mail by saying so how do

17    we move forward?  He proposes that there be individuals at

18    Medtronic assigned to the project to proceed.  Dr. Braun was

19    misled and the evidence will show that he was misled about

20    Medtronic's continued and ongoing commitment to proceed.

21            In light of the overwhelming evidence that will be

22    presented that Medtronic didn't perform the license

23    agreement and its firm promises, the question becomes what

24    evidence is Medtronic going to present to defend its action

25    and lack of conduct.  Medtronic will attempt to prove that

1    Dr. Braun waited too long to file his complaint.  The
2    problem with that is that even as late as November 23rd,
3    2008, which is Exhibit 147, Medtronic continued with its
4    misstatements to Dr. Braun, including on that day it stated
5    to him that it, quote, continues to comply with both
6    agreements in all respects.  The evidence will show that it
7    was not until Medtronic offered to return to Dr. Braun only
8    a small portion of his invention that he discovered
9    Medtronic's true intent and its true motivation.  At that
10   point they were no longer willing to return his invention.
11   They were willing to return only a piece.
12          Prior to that time Dr. Braun was trying very hard
13   to continue with his development of a fusionless device that
14   he believes very passionately would help children who are
15   suffering from scoliosis.  The evidence will show that Dr.
16   Braun in doing so was relying on Medtronic's resources and
17   its continuing and ongoing representations that it would
18   proceed.
19          Medtronic is also going to raise an issue and
20   argue that Dr. Braun didn't own his invention at the time
21   that it was provided to Medtronic, and that supposedly that
22   invention is owned by the United States Air Force, where Dr.
23   Braun worked prior to the time that he left the Air Force
24   and began at the University of Utah.  You'll hear no
25   evidence that the Air Force claims any interest in Dr.

1    Braun's ideas.  You'll hear no evidence that while he was in

2    the Air Force Dr. Braun was working on anything to do with

3    the bone anchor and a tethered device.

4            To the contrary, what you will hear evidence of is

5    that while in the Air Force Dr. Braun was doing goat and

6    animal studies on the staple device of Medtronic through

7    Medtronic's funding with Medtronic's full knowledge and

8    Medtronic's full permission.  The evidence will show that

9    Dr. Braun told Medtronic while he was in the Air Force that

10   he had ideas, and that he had ways in which he thought he

11   could improve upon the staples, which don't have the ability

12   to actively correct the scoliosis curve on the surgical

13   table.

14           Medtronic's response was to tell Dr. Braun lets

15   solidify those ideas.  They sent him literally on the day of

16   his discharge, which is Exhibit 104, they sent him a letter

17   with an invention disclosure book and said, Dr. Braun, write

18   your ideas down, which is what he did.

19           The evidence will show that Medtronic was

20   completely aware of the process that Dr. Braun went through

21   to come up with the patentable invention, and it never

22   raised any concerns with respect to the Air Force until two

23   or three years after this lawsuit was filed.

24           The last thing I want to talk to you about is

25   damages.  I am going to be very brief, but you'll be

1   presented with a calculation of Dr. Braun's profits and what

2   he should have earned in royalties under the license

3   agreement and the five percent royalty that was provided to

4   him.  The calculation of those damages will be based upon

5   Medtronic's projections of the fusionless market.  They will

6   be based upon Medtronic's evaluation of risk and success,

7   including that as of 2013 and 2014 Medtronic still believes,

8   to a high degree of probability, that a tether device can

9   effectively and safely treat adolescent idiopathic

10  scoliosis, and that it can not only treat it, but that it

11  can benefit those adolescents who will not have to have

12  their spines fused and engage in a much less invasive

13  procedure.

14          The evidence will show that Medtronic continues to

15  believe that that market is extremely profitable when and if

16  Medtronic makes the decision to conduct human clinical

17  trials necessary to complete the development process.  Dr.

18  Braun's lost profits calculation is just that, it is an

19  estimate, it is a reasonable estimate and evaluation that

20  will be presented through a qualified damages expert.

21          Thank you.

22          THE COURT:  Thank you, Mr. Bradshaw.

23          Why don't we all take a short break.  We'll

24  exchange some equipment and you can all freshen up a little

25  bit and we will come back in in about 15 minutes.

1           (WHEREUPON, the jury leaves the proceedings.)

2           THE COURT:  Anything more, counsel?

3           MR. JARDINE:  No, Your Honor.

4           THE COURT:  Let's be in recess.

5           Thank you.

6           (Recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25